## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DAVID ERMOLD; DAVID MOORE

Plaintiffs-Appellees

v.

KIM DAVIS, individually

Defendant-Appellant

On Appeal from the United States District Court for the Eastern District of Kentucky, Case No. 15-cv-00046, Honorable David L. Bunning

### DEFENDANT-APPELLANT'S OPENING BRIEF

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, KY 42502
(606) 677-2741
ACDonahue@donahuelaw-group.com

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Defendant-Appellant Kim Davis*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1 and Rule 26.1 of this Court, Defendant-Appellant Kim Davis ("Davis") states that she is an individual person, is not a subsidiary or affiliate of a publicly owned corporation, nor is there any publicly owned corporation, not a party to the appeal, that has a financial interest in its outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT………………………………………i

TABLE OF CONTENTS………………………………………………………...ii

TABLE OF AUTHORITIES………………………………………………vii

STATEMENT IN SUPPORT OF ORAL ARGUMENT…………………………..xii

INTRODUCTION……………………………………………………………….1

STATEMENT OF JURISDICTION…………………………………………...2

STATEMENT OF THE ISSUES……………………………………………………2

STATEMENT OF THE CASE……………………………………………………...7

I.      FACTUAL BACKGROUND…………………………………………………..7

    A.      Kentucky's Marriage Licensing Before *Obergefell* And The Governor's Same-Sex Marriage Licensing Mandate…………………7

    B.      Davis's Sincerely Held Religious Beliefs About Marriage……………8

    C.      The Lawsuit Giving Rise To This Appeal……………………………..9

    D.      The Incarceration Of Davis For The Exercise Of Her Religious Beliefs…………………………………………………………….10

    E.      Davis's Quest For An Accommodation, Other Existing Accommodations, And The Commonwealth's Ultimate Grant Of An Accommodation For Clerks………………………………………...11

        1.      Davis's quest for a religious accommodation…………………11

        2.      The Governor's accommodation for his attorney general…….12

3. The Governor's *ultra vires* accommodation while Davis was in jail…………………………………………………………….13

4. Legislative accommodations for religious beliefs…………….14

5. Davis's ultimate accommodation from the Commonwealth…..14

    a. The executive order giving Davis her requested accommodation……………………………………...14

    b. The legislature's permanent adoption of the accommodation……………………………………...15

F. Plaintiffs' Pursuit Of Retribution Damages…………………………16

II. PROCEDURAL HISTORY AND RULINGS ON REVIEW………………17

STANDARD OF REVIEW……………………………………………………..18

SUMMARY OF THE ARGUMENT…………………………………………...18

ARGUMENT…………………………………………………………………...19

I. THE DISTRICT COURT SHOULD NOT HAVE PERMITTED THE CASE TO BE SUBMITTED TO THE JURY BECAUSE PLAINTIFFS FAILED TO OFFER COMPETENT EVIDENCE OF DAMAGES………..19

A. Plaintiffs Bore The Burden Of Proof To Demonstrate Damages With Actual, Competent Evidence…………………………………...19

1. Proof of actual injury is required for compensatory damages…19

2. Speculation concerning damages is inadequate to satisfy Plaintiffs' burden……………………………………………...20

B.     Davis Was Entitled To Judgment As A Matter Of Law Because Plaintiffs Failed To Prove Their Damages With More Than Speculation, Conjecture, And Their Own Brief Testimony…………..21

    1.    Plaintiffs limited their damages claims to emotional distress damages……………………………………………………21

    2.    Brief testimony concerning a plaintiff's own perceived emotional injury is insufficient to submit a case to the jury…..22

    3.    Plaintiffs failed to produce evidence beyond their own mere testimony concerning their alleged emotional distress damages……………………………………………………25

        a.    Plaintiff Ermold failed to produce evidence of his claimed emotional damages beyond merely his own testimony…………………………………………25

        b.    Plaintiff Moore failed to produce evidence of his claimed emotional damages beyond merely his own testimony…………………………………………26

C.     Neither Plaintiff Testified About The Claimed Emotional Distress Of The Other Plaintiff, Or Presented Any Other Competent Evidence On Damages……………………………………………28

II.    THE DISTRICT COURT ERRED IN FINDING THAT DAVIS WAS NOT ENTITLED TO A REASONABLE ACCOMMODATION FOR HER SINCERELY HELD RELIGIOUS BELIEFS UNDER THE FIRST AMENDMENT AND KENTUCKY RELIGIOUS FREEDOM RESTORATION ACT…………………………………………………...30

A.     The Commonwealth's Failure To Grant Davis A Reasonable Accommodation For Her Sincerely Held Religious Beliefs Is Subject To Strict Scrutiny. ……………………………………...30

1. The Commonwealth's failure to timely give Davis a reasonable accommodation for her sincerely held religious beliefs was neither neutral nor generally applicable..............30

    a. The Commonwealth's failure to give Davis an accommodation was not neutral………………………..31

    b. The Commonwealth's failure to give Davis an accommodation was not generally applicable………….33

2. The Commonwealth's failure to timely grant Davis a reasonable accommodation for her sincerely held religious beliefs constitutes a substantial burden under Kentucky RFRA………………………………………………………35

B. The Commonwealth's Failure To Timely Grant Davis A Reasonable Accommodation For Her Sincerely Held Religious Beliefs Cannot Survive Strict Scrutiny……………………………………………39

1. The Commonwealth had no compelling interest in refusing to extend reasonable accommodations to Davis's sincere religious beliefs…………………………………………………..40

2. The Commonwealth's refusal to grant Davis a reasonable accommodation for her sincere religious beliefs was not the least restrictive means…………………………………………...43

III. THE DISTRICT COURT ERRED BY FINDING THAT *OBERGEFELL* CREATED A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT THAT SUPERCEDED DAVIS'S PRE-EXISTING FUNDAMENTAL, TEXTUAL CONSTITUTIONAL RIGHTS TO RELIGIOUS EXERCISE…………………………………………………………..46

A. The District Court Erred By Describing The Alleged Right Too Generally………………………………………………………..46

B.    Regardless Of The Holding Of *Obergefell*, It Was Not Clearly Established In 2015, And It Is Not Clearly Established Now, That *Obergefell*'s Holding Vitiated Textual First Amendment Rights To Free Exercise Of Religion………………………………………………49

IV.    *OBERGEFELL* SHOULD BE OVERTURNED FOR THE SAME REASONS ARTICULATED BY THE COURT IN *DOBBS*………………..54

A.    *Obergefell* Was Wrong When It Was Decided And It Is Wrong Today Because It Was Based Entirely On The "Legal Fiction" Of Substantive Due Process, Which Lacks Any Basis in The Constitution………………………………………………………………54

B.    Even If Substantive Due Process Is Not Itself Overturned, *Obergefell* Should Be, Because The Right To Same-Sex Marriage Is Neither Carefully Described Nor Deeply Rooted In The Nation's History………………………………………………………………58

1.    *Obergefell* did not even attempt a careful description of the right at issue, but explicitly shirked that requirement…………58

2.    *Obergefell*'s atextual rights creation was not deeply rooted in the Nation's history or traditions……………………………...59

CONCLUSION…………………………………………………………………...60

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS………..61

CERTIFICATE OF SERVICE……………………………………………………62

ADDENDUM…………………………………………………………Addendum 1

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)……………………………..47

*ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624 (6th Cir. 2005)………………………...38

*Agriculture Servs. Ass'n v. Ferry-Morse Seed Co.*,
551 F.2d 1057 (6th Cir. 1977)…………………………………………………..16

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)…………………...36

*Anderson v. Creighton*. 483 U.S. 635 (1987)…………………………...…43, 44, 45

*Bolden v. Se. Penn. Transp. Auth.*, 21 F.3d 29 (3d Cir. 1994)……………..………17

*Brosseau v. Haugen*, 543 U.S. 194 (2004)…………………………………...46

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)…………………………36

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)………………….*passim*

*Carey v. Piphus*, 435 U.S. 247 (1978)…………………...……………15, 16, 18, 24

*Chatman v. Slagle*, 107 F.3d 380 (6th Cir. 1997)…………………………...17, 19

*Church of the Lukumi Babalus Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)……………………………………………………..…26, 29

*City of Boerne v. Flores*, 521 US. 507 (1997)……………………………………..35

*Cope v. Heltsley*, 128 F.3d 452 (6th Cir. 1997)……………………………………46

*Daugherty v. Campbell*, 935 F.2d 780 (6th Cir. 1991)……………………………46

*Davis v. Ermold*, 141 S. Ct. 3 (2020)…………………………………...…………1, 53

*Dep't of State v. Munoz*, 144 S. Ct. 1812 (2024)………………………………..54

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022)……………………………………………………3, 50, 51, 52

*Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250 (6th Cir. 1985)……...18, 19

*Ermold v. Davis*, 855 F.3d 715 (6th Cir. 2017)……………………………………..5

*Farrar v. Hobby*, 506 U.S. 103 (1992)…………………………………………15

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)…………………………*passim*

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)………………………………...16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)………………………………………………………………36

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)………………………14

*Hensley v. State Comm'n on Judicial Conduct*,
2024 WL 3210043 (Tex. June 28, 2024)…………………………………………49

*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987)………..38

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)…………………………..15

*Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011)……………………...45

*Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146 (11th Cir. 1994)………………………46

*Long v. Norris*, 929 F.2d 1111 (6th Cir. 1991)…………………………...………..45

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020)..…..29, 35

*Masterpiece Cakeshop v. Colorado Civil Rights Comm'n.*,
584 U.S. 617 (2018)………………………………………………..…27, 47

*McAllen Grave Brethren Church v. Salazar*, 764 F.3d 465 (5th Cir. 2014)………39

*McCullen v. Coakley*, 573 U.S. 464 (2014)……………………...………35, 36

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)…………...…15, 17, 19

*Miller v. Davis,* 667 F. App'x 537 (6th Cir. 2016)…………………….....……3, 12

*Miller v. Davis,* 123 F. Supp. 3d 924 (E.D. Ky. 2015)……………..………*passim*

*Morrow v. Igleburger*, 584 F.2d 767 (6th Cir. 1978)……………………….....16

*Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981)………………………….....20

*New Doe Child #1 v. Congress of United States*, 891 F.3d 578 (6th Cir. 2018)…..34

*Obergefell v. Hodges*, 576 U.S. 644 (2015)…………………………..…………*passim*

*Occupy Nashville v. Haslam*, 769 F.3d 434 (6th Cir. 2014)………..…………42, 43

*O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011)…………………………..46

*Pavan v. Smith*, 582 U.S. 563 (2017)……………………………………………...48

*Pembaur v. City of Cincinnati*, 882 F.2d 1101 (6th Cir. 1989)……....…14, 16, 19, 24

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)………………………………………..42

*Pidgeon v. Turner*, 538 S.W.3d 73 (Tex. 2017)…………………………………...48

*Prudential Securities, Inc. v.* Yingling, 226 F.3d 668 (6th Cir. 2000)……………13

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)………………………..38

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020)………………………………...29

*Rodgers v. Fisher Body Div., Gen. Motors Corp.*,
739 F.2d 1102 (6th Cir. 1984)………………………………………………19, 24

*Sawchik v. E.I. DuPont Denemours & Co.*, 783 F.2d 635 (6th Cir. 1986)………..15

*Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507 (6th Cir. 1997)……………45

*Schneiderman v. United States*, 320 U.S. 118 (1943)……………………………1

*Seaton v. TripAdvisor LLC*, 728 F.3d 592 (6th Cir. 2013)…………………………...14

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002)………………………………..50

*Tandon v. Newsom*, 593 U.S. 61 (2021)……………………………………….……26, 35

*Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981)…………...1

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983)……….50

*United States v. Lanier*, 520 U.S. 259 (1997)………………………………………..42

*Walton v. City of Southfield*, 995 F.2d 1331 (6th Cir. 1993)………………………46

*Washington v. Glucksberg*, 521 U.S. 702 (1997)……………………....………54, 55

*Williams v. Nashville Network*, 132 F.3d 1123 (6th Cir. 1997)……………………14

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)……………………………...38

**STATUTES**

28 U.S.C. §1291………………………………………………………………………2

28 U.S.C. §1331………………………………………………………………………2

42 U.S.C. §1983………………………………………………………………………2

42 U.S.C. § 2000bb-1………………………………………………………………...36

Fed. R. App. P. 26.1………………………………………………………………….i

Ky. Rev. Stat. §150.195……………………………………...……………………10, 31, 41

Ky. Const. § 233A (2004)…………………………………………………………...3

Ky. Rev. Stat. § 402.005 (1998)……………………………………………………3

Ky. Rev. Stat. § 402.100 (2006)…………………………………….………3, 11, 32

x

Ky. Rev. Stat. § 402.240………………………………………………………10, 40

Ky. Rev. Stat. § 446.350 (2013)……………………………...…………10, 31, 37

N.C. Gen. Stat. § 51-5.5…………………………………………………..41

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant Kim Davis ("Davis") hereby requests oral argument because this case presents new and complex issues of federal law concerning the intersection of the First Amendment religious liberty rights of those officials who are tasked with enforcing state laws on marriage licensing after the Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015).

**INTRODUCTION**

"In *Obergefell v. Hodges*, the Court read a right to same-sex marriage into the Fourteenth Amendment, even though that right is found nowhere in the text." *Davis v. Ermold*, 141 S. Ct. 3 (2020) (Thomas, J., Statement). As was predicted at the time *Obergefell* was decided, it "would threaten the religious liberty of many Americans who believe that marriage is a sacred institution between one man and one woman." *Id.* "As a result of this Court's alteration of the Constitution, Davis found herself with a choice between her religious beliefs and her job. When she chose to follow her faith . . . she was sued almost immediately for violating the constitutional rights of same-sex couples." *Id.* And, after being sued, she was thrown in jail for doing so. In a country birthed by those "who sought refuge in a new world from the cruelty and oppression of the old, where men have been burned at the stake, imprisoned, and driven into exile in countless numbers for their political and religious beliefs," *Schneiderman v. United States*, 320 U.S. 118, 120 (1943), we can do better, and the Constitution demands we do so. Davis was "put to a choice between fidelity to religious belief or cessation of work" (and ultimately jail). *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). The First Amendment precludes that Hobson's choice, yet its protections were not afforded to Davis. The district court should be reversed.

# STATEMENT OF JURISDICTION

Plaintiffs brought their claims under 42 U.S.C. §1983, and the district court had jurisdiction under 28 U.S.C. §1331. After opinions and orders on summary judgment and a trial on the merits resulting in the district court's final judgment (Final Judgment, RE 166, PageID #2590), this Court has jurisdiction under 28 U.S.C. §1291.

# STATEMENT OF THE ISSUES

(1)     Whether the district court erred in submitting the case to the jury to consider an award for damages where Plaintiffs presented no evidence of compensatory damages and presented no evidence of emotional distress other than bare subjective testimony of hurt feelings.

(2)     Whether Defendant Clerk, who was permitted to opt out of issuing hunting and fishing licenses for reason of conscience, and who shortly after the commencement of the instant lawsuit received accommodation from the Governor of Kentucky and by a unanimous state legislature to opt out of issuing marriage licenses for same-sex ceremonies, was entitled to a reasonable accommodation of her religious beliefs under the First Amendment Free Exercise Clause and the Kentucky Religious Freedom Restoration Act.

(3)     Whether *Obergefell v. Hodges*, 576 U.S. 644 (2015), which shredded the Commonwealth of Kentucky's marriage laws, clearly established a constitutional

right to marry for same-sex couples that instantly overrode the constitutional right to religious accommodation under federal and state law, when the accommodation sought was merely to remove the issuing clerk's name and title from marriage licenses that conflicted with sincerely-held religious beliefs.

(4)     Whether *Obergefell v. Hodges*, 576 U.S. 644 (2015), clearly established a constitutional right to marry for same-sex couples that preempts all free exercise rights of individual state marriage licensing officials regardless of the ready availability of marriage licenses throughout the state for any couple.

(5)     Whether *Obergefell v. Hodges*, 576 U.S. 644 (2015), should be overruled following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND.

### A.     Kentucky's Marriage Licensing Before *Obergefell* And The Governor's Same-Sex Marriage Licensing Mandate.

Prior to *Obergefell*, Kentucky constitutionally and statutorily defined marriage as the union between one man and one woman. Ky. Const. § 233A (2004); Ky. Rev. Stat. § 402.005 (1998). The pre-*Obergefell* statutory marriage license form included a license to marry under the name and authority of the county clerk. Ky. Rev. Stat. §402.100 (2006); *Miller v. Davis,* 123 F. Supp. 3d 924, 931-32 (E.D. Ky. 2015), *vacated*, 667 F. App'x 537 (6th Cir. 2016).

On June 26, 2015, moments after the Supreme Court announced its decision in *Obergefell*, former Kentucky Governor Steve Beshear issued a directive to all Kentucky county clerks ("Mandate") to "recognize as valid all same sex marriages performed in other states and in Kentucky." (Mandate, RE 27-1, PageID #128.) In this Mandate, Governor Beshear further commanded that Kentucky "must license and recognize the marriages of same-sex couples," and ordered the creation and distribution of new marriage license forms to accommodate same-sex couples. (*Id.*) The new form retained the requirement to issue the license under the name and authority of the county clerk. (RE 27-2, PageID #130.)

**B.    Davis's Sincerely Held Religious Beliefs About Marriage.**

Davis possesses a sincerely held Christian belief that marriage is a union between one man and one woman, only. (Am. Compl., RE 27, PageID #121, ¶¶ 21, 23.) Davis cannot authorize the marriage of same-sex couples because it violates her core religious beliefs that the endorsement of her name and authorization equates to approval and agreement. *See Miller*, 123 F. Supp. 3d at 932. Following the Mandate, due to her religious beliefs, Davis discontinued issuing *any and all* marriage licenses. (Am. Compl., RE 27, PageID #121, ¶¶ 21, 23.) *See also Miller*, 123 F. Supp. 3d at 929-30. Rather than withdraw her authorization for only same-sex marriages, Davis withdrew her authorization to issue *any* marriage license in her name to *any* couple. *Miller*, 123 F. Supp. 3d at 929-930. Her intent in doing so was a temporary policy

until her religious beliefs could be accommodated, and, as the President the Kentucky Senate wrote in an amicus brief in support of Davis, "the concept of marriage as between a man and a woman is so interwoven into KRS Chapter 402 that the defendant County Clerk cannot reasonably determine her duties until such time as the General Assembly has clarified the impact of *Obergefell* by revising KRS Chapter 402 through legislation." (RE 89-14, PageID #902.)

### C.    The Lawsuit Giving Rise To This Appeal.

Plaintiffs filed suit against Davis on July 10, 2015, after the virtually identical *Miller v. Davis* lawsuit was filed, but before the Executive Order and enactment of SB 216 that granted Davis an accommodation. (Compl., RE 1, PageID ##1-7.) Following this Court's vacatur of the *Miller* preliminary injunction orders, the district court consolidated the instant case with *Miller* and *Yates v. Davis*, another case challenging Davis's accommodation, under the caption *In re: Ashland Civil Actions*, for the purpose of dismissing all three actions as moot. (Order, RE 19, PageID ##95-97.)

Plaintiffs appealed the dismissal of their case. (RE 20, PageID ##98-100.) This Court reversed the dismissal and remanded the case for reinstatement. *Ermold v. Davis*, 855 F.3d 715 (6th Cir. 2017). The district court granted Plaintiffs leave to amend their complaint (Order, RE 26, PageID #117), which Plaintiffs did on June 8, 2017 (Am. Compl., RE 27, PageID ##119-136).

5

According to the Amended Complaint, Plaintiffs are two males residing in Rowan County, Kentucky, who desired but were denied a Kentucky marriage license. (Am. Compl., RE 27, PageID ##119, 121, 123.) Based on *Obergefell* and Governor Beshear's Mandate, Plaintiffs alleged that their constitutional right to marry includes the right to be issued a marriage license by a specific person, Davis, and in a specific location, Rowan County. (*Id.*, PageID ##119-121, 124.) Davis's observance of her "deeply held Christian beliefs" about marriage, Plaintiffs claim, violated their constitutional right to marry. (*Id.*, PageID ##121, 124.) Plaintiffs sought actual and punitive damages, pre- and post-judgment interest, and attorneys' fees and costs. (*Id.*, PageID #25.)

### D. The Incarceration Of Davis For The Exercise Of Her Religious Beliefs.

Plaintiffs were not the first to file suit against Davis following *Obergefell*. On July 2, 2015, less than one week after Governor Beshear issued his Mandate, the plaintiffs in *Miller v. Davis* (two same-sex and two opposite-sex couples) filed suit alleging federal constitutional claims and demanding that Davis issue them marriage licenses issuance of marriage licenses to them in Rowan County, under Davis's name and authority. *Miller*, 123 F. Supp. 3d at 930-31. The *Miller* Plaintiffs filed the action on behalf of themselves and "a putative class of individuals who are qualified to marry and who intend to seek a marriage license from the Rowan County Clerk." *Id.* On August 12, 2015, the district court preliminarily enjoined Davis, in her official

capacity, "from applying her 'no marriage licenses' policy to future marriage license requests submitted by Plaintiffs." *Id.* at 930, 944. On September 3, 2015, the court expanded the preliminary injunction to apply to other individuals who are legally eligible to marry in Kentucky. On the same day, the district court held Davis in contempt of the preliminary injunction, and remanded Davis to the custody of the United States Marshal pending compliance. (Mem. Op. & Order, RE 49, PageID #296.)

### E. Davis's Quest For An Accommodation, Other Existing Accommodations, And The Commonwealth's Ultimate Grant Of An Accommodation For Clerks.

#### 1. Davis's quest for a religious accommodation.

Prior to the Supreme Court's decision in *Obergefell*, Davis began seeking an accommodation for her sincerely held religious convictions and those of her fellow clerks. Soon after the Supreme Court granted certiorari in *Obergefell*, Davis wrote to Senator Robertson in the Kentucky legislature requesting that the Commonwealth take action to protect the religious convictions of county clerks. (RE 89-12, Page ID #899.) Davis wrote that "in light of the Supreme Court's decision to look at the issue in April, I feel it is imperative that we be ready to stand with our uncompromising convictions, holding strong to our morals, and beliefs." (*Id.*) She noted, "I beseech you to give thoughtful consideration to this matter, as it is of vital importance, not

only to me, as a new Clerk, but to the Kentucky County Clerk's Association who has formed a formal committee to address this issue." (*Id.*)

In addition to seeking a legislative solution prior to the Supreme Court's decision in *Obergefell*, Davis also petitioned the Governor of Kentucky in the immediate aftermath of *Obergefell* so that she could avoid the scenario that led to the instant lawsuit. On July 8, 2015, Davis wrote a letter to the Kentucky Governor informing him that *Obergefell* was on a collision course with the sincere religious beliefs of many clerks. (RE 89-13, PageID #900.) Davis requested that the Governor—who was the only individual with authority to do so—convene a special session of the legislature to consider "commonsense legislation that would modify Kentucky's marriage laws to satisfy the concerns of the majority of Clerks, while still abiding by the *Obergefell* ruling." (*Id.*) He did not respond.

## 2. The Governor's accommodation for his attorney general.

Despite his newly-minted mandate that all Kentucky officials follow their duties (as defined by himself), the Governor did not impose that same mandate on his Attorney General. According to the Attorney General's proclamation at the time, "There are those who believe it's my mandatory duty, regardless of my personal opinion, to continue to defend this case . . . I can only say that I am doing what I think is right. In the final analysis, I had to make a decision that I could be proud of – for me now, and my daughters' judgment in the future." (RE 89-6, PageID 749-

750 (emphasis added). The Governor did not force the Attorney General to abandon his "inescapable" conscience and instead hired outside counsel to represent Kentucky in defending its own Constitution and democratically-enacted laws— which cost Kentucky upwards of $200,000. (*Id.*, PageID #749-750, 756-757.) In other words, the Governor's "do your job or resign" policy applied only to Davis, not the Attorney General.

### 3. The Governor's *ultra vires* accommodation while Davis was in jail.

On September 4, 2015, the day after Davis was jailed for contempt of the *Miller* injunction, Plaintiffs received a Kentucky marriage license from a Rowan County deputy clerk, on a license form altered to remove Davis's name, and without Davis's authorization. (Am. Compl., RE 27, PageID ##121-22; Marriage License, RE 27-2, PageID #130.) Then-Governor Beshear, however, who first authorized and directed the alteration of Kentucky marriage license forms in response to *Obergefell*, authorized the altered form from the deputy clerk after-the-fact. (Am. Compl. Ex. 4, RE 27-4, PageID #134 ("'I'm . . . confident and satisfied that the licenses that were issued last week (and) this morning substantially comply with the law in Kentucky' . . . . 'And they're going to be recognized as valid in the Commonwealth.").) The Governor's authorization also extended to marriage license forms which were further altered by Davis, to clarify the removal of her name and authorization, upon her return to work after her imprisonment. (*Id.*, PageID ##134-35.)

### 4.  Legislative accommodations for religious beliefs.

Kentucky law provides a statutory exception for the sincerely held religious beliefs of Commonwealth officials that object to providing or issuing other forms of licensure. One exception that already existed that could have accommodated Davis's sincere religious convictions would have been to allow the county judge/executive to license a marriage by "a memorandum thereof" as an alternative to the KDLA-prescribed form. *See* KRS 402.240.

Additionally, Kentucky law provides that county clerks may be excused (*i.e.*, accommodated) from issuing hunting and fishing licenses, which any county clerk may claim simply by submitting a written memorandum. *See* KRS 150.195(2).

### 5.  Davis's ultimate accommodation from the Commonwealth.

#### a.  The executive order giving Davis her requested accommodation.

On December 22, 2015, then-newly elected Kentucky Governor Matt Bevin issued Executive Order 2015-048 Relating to the Commonwealth's Marriage License Form ("Executive Order"), which explicitly acknowledged the protections afforded county clerks under Kentucky's Religious Freedom Restoration Act, Ky. Rev. Stat. § 446.350 (2013). (Executive Order, RE 29-1, PageID ##174-176.) Specifically, the Executive Order established that (1) the previous Governor's Mandate placed a substantial burden on the free exercise of religion by some county clerks and their employees, (2) the Kentucky RFRA requires that the Commonwealth

use the least restrictive means available to carry out Kentucky marriage license policy in light of that substantial burden, (3) there is no compelling governmental interest to justify requiring the name and authority of county clerks on marriage licenses, (4) a reasonable accommodation for county clerks could easily and must be made, and (5) the Commonwealth is legally obligated to comply with Kentucky RFRA through the creation and provision of a revised marriage license form removing the requirement of a county clerk's name and authority. (*Id.*)

### b. The legislature's permanent adoption of the accommodation.

On July 14, 2016, Kentucky Senate Bill 216 ("SB 216") took effect, permanently modifying Kentucky law regarding the issuance and authorization of marriage licenses beyond the Executive Order. Specifically, SB 216 expressly modified the Kentucky marriage licensing scheme to remove entirely a County Clerk's name, personal identifiers, and authorization from any license, thereby providing through a permanent change in the law the precise religious accommodation Davis sought before *Obergefell*. The Kentucky Legislature unanimously passed SB 216 and Governor Bevin signed it into law on April 13, 2016, thereby amending Ky. Rev. Stat. §§ 402.100 and 402.110. *See* 2016 Kentucky Laws Ch. 132 (SB 216), General Assembly Reg. Sess. (Ky. 2016).

### F.    Plaintiffs' Pursuit Of Retribution Damages.

SB 216 rendered moot Davis's appeals from the district court's preliminary injunction orders in *Miller*. Accordingly, this Court dismissed the *Miller* appeals and remanded the case to the district court, instructing it to vacate the August 12 and September 3, 2015, preliminary injunctions. *Miller v. Davis,* 667 F. App'x 537 (6th Cir. 2016). Discontent with the prospective injunctive relief afforded them under *Miller* and despite obtaining the marriage license they sought, Plaintiffs pursued "retrospective money damages." (Mem. Op., RE 49, PageID #295.) The district court entered summary judgment against Davis as to liability, and ordered a trial on damages. (Mem. Op. and Order, RE 108.) At trial, Plaintiff Ermold testified that he "wanted [Davis] to receive consequences for her actions." (Trial Tr., RE 169, PageID #2883.) He further testified that he agreed with commenters on his social media accounts that Plaintiffs should "Go for [Davis's] throat," because "[t]hat nasty bitch deserves to die." (*Id.*) Plaintiff Ermold has also testified that he liked the comment that: "I would love to see [Davis] hang . . . slowly." (*Id.*, PageID #2886.) At trial, despite presenting no evidence of actual damages, the jury awarded Plaintiffs $50,000 per Plaintiff. The $100,000 damages award was then supplemented with an award of fees and costs in the amount of $260,084.70, bringing Davis's total financial liability to Plaintiffs to $360,084.70. (Judgment, RE166, PageID #2590.) A separate jury sitting at the same time in the consolidated trial of *Yates v. Davis*

awarded a verdict of $0.00 to those two plaintiffs. (No. 0:15-cv-62, *Yates*, RE145, PageID #2264.)

## II.  PROCEDURAL HISTORY AND RULINGS ON REVIEW.

After three independent actions—sometimes consolidated, other times not—and numerous appeals to this Court and the Supreme Court, the district court held a jury trial on damages in September 2023. The orders on review from that trial and those preceding it include the district court's: (1) order that Plaintiffs' right to have a marriage license issued by a specific individual regardless of that individual's sincerely held religious objections to such action was clearly established by *Obergefell* and precluded any immunity for Davis (Mem. Op., RE 49, PageID ##294-314); (2) order that the Free Exercise Clause did not require that Davis be provided any accommodation for her sincere religious convictions (*Id.*, PageID ##312-313); (3) order denying Davis's Renewed Motion for Judgment (Mem. Op., RE 175, PageID #3125-30); and (4) order denying Davis's motion for judgment as a matter of law (Trial Tr., RE 170, PageID ##2940-45; RE 151, PageID #2177.) Aside from the district court's order on Davis's Renewed Motion for Judgment as a Matter of Law, which is independently appealable, each one of these decisions merged into the Final Judgment entered by the district court on December 28, 2023, and is thus properly before this Court. *Prudential Securities, Inc. v.* Yingling, 226 F.3d 668, 671 (6th Cir. 2000).

## STANDARD OF REVIEW

The standard of review for all issues is *de novo*. *Williams v. Nashville Network*, 132 F.3d 1123, 1130 (6th Cir. 1997) (Rule 50(v) motion); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir. 2013) (First Amendment requires *de novo* review and independent examination of whole record); *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (qualified immunity).

## SUMMARY OF THE ARGUMENT

Plaintiffs failed to present competent evidence of any damages, and instead presented the jury with little more than speculation and conjecture. Their case should never have been presented to the jury, and the district court erred in doing so. Moreover, Davis was entitled to a reasonable accommodation for her sincere religious convictions under the First Amendment and Kentucky's Religious Freedom Restoration Act, and the government's refusal to timely grant such an accommodation impermissibly infringed her religious exercise. Finally, the district court's determination that *Obergefell* clearly established the right to obtain a marriage license from a specific individual without any accommodation for such individual's religious beliefs was in error.

## ARGUMENT

## I. THE DISTRICT COURT SHOULD NOT HAVE PERMITTED THE CASE TO BE SUBMITTED TO THE JURY BECAUSE PLAINTIFFS FAILED TO OFFER COMPETENT EVIDENCE OF DAMAGES.

"[T]he decision to grant judgment as a matter of law or to take the case away from the jury is appropriate 'whenever there is a *complete absence of pleading or proof on an issue material to the cause of action*.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999) (quoting *Sawchik v. E.I. DuPont Denemours & Co.*, 783 F.2d 635, 636 (6th Cir. 1986)) (emphasis added).

### A. Plaintiffs Bore The Burden Of Proof To Demonstrate Damages With Actual, Competent Evidence.

#### 1. Proof of actual injury is required for compensatory damages.

"[T]he basic purpose of a §1983 damages award is to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). "*[N]o compensatory damages may be awarded in a §1983 actions absent proof of actual injury.*" *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (emphasis added); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986) (same). *See also Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1104 (6th Cir. 1989). Damage awards in Section 1983 actions "operate[] through the mechanism of damages that are *compensatory*—damages grounded in determinations of plaintiffs' actual losses." *Stachura*, 477 U.S. at 307 (emphasis original).

No matter the particular damages claimed, the jury is not permitted to award any damages absent *actual proof*. *See Pembaur*, 882 F.2d at 1104 ("Damages for pain and suffering, mental anguish, and the like are available to the extent that actual injury has been proved."). It does not matter that the alleged damages may be difficult to prove—actual proof is required. *Carey*, 435 U.S. at 263-64. Indeed, "*an award of damages must be supported by competent evidence concerning the injury*." *Id.* at 264 n.20 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)) (emphasis added). "Once a violation of civil rights is found, a plaintiff may recover for out-of-pocket expenses and emotional distress, *but there must be sufficient evidence*" to award damages. *Morrow v. Igleburger*, 584 F.2d 767, 769 (6th Cir. 1978) (emphasis added).

## 2. Speculation concerning damages is inadequate to satisfy Plaintiffs' burden.

This actual proof standard articulated in *Carey*, *Farrar*, and *Stachura* is not satisfied by speculation and conjecture. "*Damages are not permitted which are remote and speculative in nature*." *Agriculture Servs. Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977) (emphasis added). Indeed, "[t]o set a quantifiable damage figure arbitrarily is impermissible. It would not be a reasonable inference but would be pure guesswork." *Id.* "*Carey*'s requirement that actual injury be proven before a plaintiff may recover serves merely to ensure that plaintiffs are

not compensated for illusory injury." *Chatman v. Slagle*, 107 F.3d 380, 385 (6th Cir. 1997) (quoting *Bolden v. Se. Penn. Transp. Auth.*, 21 F.3d 29, 35 (3d Cir. 1994)).

The actual proof standard "simply leaves no room for non-compensatory damages measured by the jury's perception of the abstract importance of a constitutional right." *Stachura*, 477 U.S. at 310 (cleaned up). The reason for this is simple:

> damages based on the "value" of constitutional rights are an unwieldy tool for ensuring compliance with the Constitution. History and tradition do not afford any sound guidance concerning the precise value that juries should place on constitutional protections. *Accordingly, were such damages available, juries would be free to award arbitrary amounts without any evidentiary basis, or to use their unbounded discretion to punish unpopular defendants*.

*Id.* (emphasis added).

**B. Davis Was Entitled To Judgment As A Matter Of Law Because Plaintiffs Failed To Prove Their Damages With More Than Speculation, Conjecture, And Their Own Brief Testimony.**

**1. Plaintiffs limited their damages claims to emotional distress damages.**

In their Complaint, Plaintiffs initially prayed for "emotional damages, humiliation, economic damages, and other compensatory damages," "special damages in an amount to be established at trial," and "punitive damages." (Complaint, RE 1, PageID ##3, 5.) In their pre-trial filings, Plaintiffs dropped their pursuit of all damages except "mental anguish, emotional distress, humiliation, and

reputational damages." (Proposed Special Verdict Form, RE136, PageID #2037.) And, removing all doubts that Plaintiffs were not seeking anything other than emotional distress damages, Plaintiffs explicitly informed the court prior to the trial that there would be no claim for lost wages. (Trial Tr., RE 167, PageID ##2623-2624.) Notably, Plaintiffs based their entire claim to $50,000 each on the loss of Plaintiff Ermold's employment and had no other way of calculating their claimed damages, (Trial Tr., RE 169, PageID #2805-2807; *id.* PageID #2862-2870.) Plaintiffs similarly withdrew their claim for punitive damages prior to trial. (*Id.*, PageID #2613), but the evidence at trial indisputable demonstrated that the employment loss had no connection to Davis. (Trial Tr., RE169, PageID ##2919-2926.) And, as the Court noted, Plaintiffs had withdrawn their claims for reputational damages based on allegations relating to a church sign. (*Id.*, PageID #2621.)) Thus, all that was left of Plaintiffs' damages claims at trial was emotional distress.

### 2. Brief testimony concerning a plaintiff's own perceived emotional injury is insufficient to submit a case to the jury.

The standards applicable to compensatory damages awards apply equally to Plaintiffs' claims for emotional damages. *Carey*, 435 U.S. at 264 n.20. Emotional distress damages are permissible in Section 1983 actions, "but there must be sufficient evidence to support the award." *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1259 (6th Cir. 1985).

And, as a host of Sixth Circuit precedent indicates, *the mere brief testimony of the Plaintiffs concerning their alleged injury—without more—is not sufficient to support a finding of damages*. *See, e.g.*, *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir. 1984) (holding that damages for emotional distress cannot be based solely on "brief testimony" of the plaintiff claiming such damages); *Chatman*, 107 F.3d at 386 (same); *Erebia*, 772 F.2d at 1259 (same); *Pembaur*, 882 F.3d at 1104 (same).

In *Erebia*, the only proof plaintiff had presented regarding emotional distress "consisted of statements that he was 'highly upset' about the slurs and that 'you can only take so much.'" 772 F.2d at 1259. The Sixth Circuit held that this mere testimony alone "is insufficient to support [a] verdict for compensatory damages because it does not satisfy the requirements of *Rodgers* and *Carey*." *Id.*

In *Pembaur*, the district court noted that "[i]t is simply not enough for a plaintiff to point a finger at a defendant" and claim their emotional injuries relate to that defendant's alleged tortious conduct. 745 F. Supp. 446, 456 (S.D. Ohio 1990). Rather, a plaintiff claiming emotional distress injuries must come forward with competent proof—beyond brief self-serving testimony—to satisfy the *Stachura* dictates. *Id.* at 456-57. "Without such proof, the Court engages in speculation and caprice as to what compensable damages, if any, are owing from [defendant]." *Id.*

The Seventh Circuit's decision in *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981) is also instructive. The court noted that "mental and emotional distress caused by the denial of [constitutional] rights is compensable," but that "an award of damage for such injury will not stand without proof that such injury was actually caused." *Id.* at 1172. "The only evidence of injury contained in this record was Nekolny's testimony that on learning he was terminated he was 'very depressed'" and that the plaintiff was "completely humiliated." *Id.* The Seventh Circuit held that such brief testimonial "evidence is insufficient to constitute proof of compensable mental or emotional injury." *Id.* Indeed, brief testimony by a party that "he was depressed, a little despondent, or even completely humiliated . . . is not enough to establish injury even when the statement is considered along with the facts of this case." *Id.* at 1172-73. And, if that is all the proof presented, "plaintiffs were not entitled to damages for emotional injury and the award of those damages must be reversed." *Id.* at 1173.

Here, as demonstrated *infra*, the only proof Plaintiffs offered to support their alleged emotional distress was their brief testimony of their own perceived damages, the value of which Plaintiffs readily admit they have no knowledge or understanding. No other evidence was presented, and that is plainly insufficient. The district court erred in giving the damages case to the jury.

### 3. Plaintiffs failed to produce evidence beyond their own mere testimony concerning their alleged emotional distress damages.

#### a. Plaintiff Ermold failed to produce evidence of his claimed emotional damages beyond merely his own testimony.

In his sworn testimony before the jury, Plaintiff Ermold testified that he did not know how to calculate his alleged damages, or upon what evidence he was basing his claim for $50,000 in damages. When asked if his alleged damages were based on any consultation with medical professionals regarding his alleged injuries, Plaintiff Ermold testified he had no such expenses or damages. (Trial Tr., RE 169, PageID ##2854-2855.) Plaintiff Ermold was asked whether he even sought the advice or treatment of a medical professional to deal with his alleged emotional distress and that alleged exacerbation of his purportedly pre-existing condition. He testified that he did not and that there had been no treatment or diagnosis as a result of Davis's actions. (*Id.*, PageID ##2858-2859.) And, Plaintiffs cannot base their damages claim on the alleged worsening or exacerbation of a pre-existing medical condition because Plaintiffs failed to provide any supporting expert testimony from medical professionals. *See, e.g.*, *Scott v. Memorial Health Care Sys., Inc.*, 660 F. App'x 366 (6th Cir. 2016); *Knowles v. Wal-Mart Stores East, L.P.*, 588 F. Supp. 3d 748, 751-52 (W.D. Ky. 2022).

Plaintiff Ermold was asked whether he had *any competent evidence* upon which to base his calculation of damages. *He had none.*

> Q: How much of the $50,000 that you're asking this jury to give you is related to humiliation from the sign versus the, for example, the loss of your job at UPIKE?
>
> A: So when you're asked about – *I don't know. I have to give you the same answer that my husband gave you. I don't know how to calculate pain and suffering, emotional damages, things like that. I don't know how to calculate those things.*
>
> So all I had at that time was I was unemployed. I had a reference from the last job I had, and I used that reference.
>
> Q: So it's true, then, you cannot calculate or make a division between the two items of damages that I've just discussed, correct?
>
> A: Humiliation is humiliation. They're the same thing.
>
> Q: Is the answer to my question correct?
>
> A: *I can't estimate. I don't know how to do that.*

(*Id.*, PageID ##2878-2879 (emphasis added).)

### b. Plaintiff Moore failed to produce evidence of his claimed emotional damages beyond merely his own testimony.

In his sworn testimony, Plaintiff Moore specifically testified that he did not lose any money, did not seek any counseling or medical treatment for alleged emotional distress, and did not know even how he arrived at his allegations of $50,000 in damages. (*Id.*, PageID #2804.) After initially attempting in discovery to base his alleged damages on the loss of Plaintiff Ermold's position at University of

Pikeville,[1] Plaintiff Moore was forced to recant that testimony and testified to the jury that he did not actually know what his alleged damages were based upon and did not know how to calculate them. (*Id.*, PageID #2806.)

And, in fact, Plaintiff Moore's testimony essentially admitted that his proof of damages was based solely on speculation as to what the value and amount of his alleged injuries were. (*Id.*, PageID ##2808-2809 ("*I don't know how people calculate any of this stuff, you know. I don't know what that's worth.*" (emphasis added).); (*See also id.*, PageID #2811 ("So I don't know how to come to that number.").)

And, if the testimony elicited from cross-examination during trial was not alone sufficient to demonstrate the utter lack of proof Plaintiffs put forward regarding their damages, on direct examination, Plaintiff Moore specifically testified: "*I don't know what the value is. That's up to the jury to decide. It's up to other people to decide what the value is. I don't know. Maybe it has no value. I don't know.*" (*Id.*, PageID ##2797 (emphasis added).) A plaintiff bearing the burden to demonstrate with competent evidence that he incurred damages, and to prove the amount of those damages, falls significantly short when he concedes that his injury "maybe [] has no value." The case should never have been presented to the jury.

---

[1] The Associate Vice President for UPIKE likewise testified at trial that Plaintiff's contract was not renewed and that it had nothing to do with Davis or this case. (Trial Tr., RE169, PageID ##2919-2926.)

**C. Neither Plaintiff Testified About The Claimed Emotional Distress Of The Other Plaintiff, Or Presented Any Other Competent Evidence On Damages.**

Because Plaintiffs' only purported proof to the jury included their own brief testimony of feeling humiliated, rather than the testimony of doctors, mental health professionals, or others who observed their alleged distress, it was plainly insufficient. As the Supreme Court noted in *Carey*, even though emotional distress damages are "essentially subjective, genuine injury in this respect may be evidenced by one's conduct *and* observed by others." 435 U.S. at 264 n.20 (emphasis added); *see also Rodgers*, 739 F.2d at 1108 (same). In *Pembaur*, the Sixth Circuit noted a plaintiff had presented sufficient evidence when he testified himself *and* presented the testimony of a mental health professional. 739 F.2d at 1108. As demonstrated *supra*, Plaintiffs presented no such testimony.

Plaintiffs did not even seek the help of any mental health professional for their alleged emotional distress, let alone bring a medical witness to testify at trial. (Trial Tr.*,* RE 169, PageID ##2854-2855.) Notably, Plaintiffs—though married and admittedly spending much time together after the alleged incident with Defendant—did not even present testimony to the jury of one another's emotional distress. In not one instance of the trial testimony did Mr. Ermold testify about his observations of Mr. Moore's claimed emotional distress, nor did Mr. Moore ever testify about his observations of Mr. Ermold's claimed emotional distress. The only purported

evidence before the jury was Plaintiff Ermold's brief testimony about his own claimed emotional damages, and Plaintiffs Moore's brief testimony about his own claimed emotional damages, neither of which could be quantified, calculated, or substantiated with any other proof. This falls far short of the mark required by *Carey*, *Rodgers*, and *Pembaur*.

Here, as demonstrated *supra*, Plaintiffs presented nothing more than mere testimony that they were upset or felt humiliated. Plaintiffs' testimony was limited to "I'm just saying how I feel about" the damages award, "[t]hat's how we felt" about the damages award, "I don't know how people calculate this stuff," "I don't know what that's worth," and "I don't know how to come to that number." (*See supra* Section I.B.) What Plaintiffs offered here was mere conclusions, admissions that they did not know what provided the basis for their alleged damages, and could not quantify any of it. That is simply insufficient. Plaintiffs bore the burden of proof on their damages claims, and Plaintiffs failed to satisfy it. And, because they were fully heard on the issue of damages yet failed to produce competent evidence to justify any award of emotional distress damages, the district court should never have given the matter to the jury.

II. **THE DISTRICT COURT ERRED IN FINDING THAT DAVIS WAS NOT ENTITLED TO A REASONABLE ACCOMMODATION FOR HER SINCERELY HELD RELIGIOUS BELIEFS UNDER THE FIRST AMENDMENT AND KENTUCKY RELIGIOUS FREEDOM RESTORATION ACT.**

The district court held that, under *Obergefell*, Davis was not entitled to a reasonable accommodation and that her reliance on the First Amendment to justify her decision to follow her conscience did not permit her to "consciously disregard her duties." (Mem. Op., RE 108, PageID #1960.) That decision was in error.

A. **The Commonwealth's Failure To Grant Davis A Reasonable Accommodation For Her Sincerely Held Religious Beliefs Is Subject To Strict Scrutiny.**

1. **The Commonwealth's failure to timely give Davis a reasonable accommodation for her sincerely held religious beliefs was neither neutral nor generally applicable.**

"A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalus Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The Commonwealth's failure to give Davis a timely and reasonable accommodation for her sincerely held religious beliefs is subject to strict scrutiny under the First Amendment because it was neither neutral nor generally applicable.

### a. The Commonwealth's failure to give Davis an accommodation was not neutral.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). "Here, that means the [Commonwealth] was obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [Davis's] religious beliefs." *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n.*, 584 U.S. 617, 638 (2018). Governor Beshear's Mandate was not neutral as demonstrated by its overt hostility towards particular religious beliefs and the intentional denial of KRFRA rights implicit in the Mandate.

The Governor's Mandate comprised several official and unilateral pronouncements of Kentucky marriage policy by the Governor, beginning with the Governor's public assent to the Attorney General's refusal to defend Kentucky's laws defining marriage on appeal based on his purported "pray[ing] over this decision" and "doing what I think is right" and "mak[ing] a decision that I could be proud of." (RE 89-6, PageID #857.) Unlike his pronouncements to county clerks such as (and specifically) Davis, the Governor did not lecture the Attorney General that "when you accepted this job and took that oath, it puts you on a different level," or "[y]ou have official duties now that the state law puts on you." (RE 89-5, PageID #853.) Nor did Governor Beshear publicly chastise the Attorney General for

"refusing to perform [his] duties" and failing to "follow[] the law and carry[] out [his] duty," or admonish Conway to "comply with the law regardless of [his] personal beliefs" or resign. (*Id.*)

In fact, contrary to how the Governor permitted the Attorney General to ignore his sworn duties to defend the laws of the Commonwealth, the Governor said to Davis that "if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that you were elected to do, then obviously the honorable course to take is to resign and let someone else step-in who feels that they can fulfill these duties." (*Id.*) Thus, although Governor Beshear gave his Attorney General a pass for his conscience about marriage without any threats of repercussion, clerks like Davis were repeatedly told by Governor Beshear to abandon their religiously informed beliefs or resign.

Moreover, Governor Beshear flatly denied any accommodation to clerks seeking a way to avoid having to issue the KDLA-prescribed marriage licenses under their name and authority based on their religious objections to same-sex marriage, but subsequently and gratuitously granted that very accommodation to same-sex couples who received altered marriage licenses while Davis was in jail. (RE 27-4, Page ID # 134.) Refusing an accommodation on religious grounds and then granting it on nonreligious grounds is the opposite of religious neutrality.

### b. The Commonwealth's failure to give Davis an accommodation was not generally applicable.

Governor Beshear's Mandate not only fails neutrality, it also fails general applicability. "[N]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). A law can also fail general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*

In *Fulton*, the city policy that disqualified CSS from receiving foster care referrals from the city reserved to a single city official the sole discretion to grant exceptions to the policy. *Id.* at 535. The Supreme Court held that this "system of individualized exemptions" rendered the policy not generally applicable, such that the city "may not refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* (cleaned up); *see also Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) ("The real question goes to exceptions."); *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) ("Faith-based discrimination can come in many forms.").

Here, the Governor's authorizing alterations to the KDLA-prescribed marriage license form, twice—once for same-sex couples who received licenses while Davis was in jail, and again when Davis returned to work—proves that the Governor reserved to himself the unfettered discretion to grant individualized exceptions to his marriage license mandate. And, he exercised that discretion solely for non-religious reasons. That is the definition of individualized exemptions that preclude any finding of general applicability. *Fulton*, 593 U.S. at 534 ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

Moreover, the disparate treatment afforded to different government officials concerning their official duties likewise demonstrates the Commonwealth's treatment of Davis was not generally applicable. The Commonwealth permitted the Attorney General to ignore his duty to defend the Commonwealth's laws, *i.e.*, provided him an accommodation for his convictions, but denied that same exemption to Davis who sought accommodation, on religious grounds, to refrain from lending her name to a same-sex marriage license as a matter of conscience.

Finally, the Commonwealth's statutory exemption for clerks in other licensing contexts negates the general applicability of Governor Beshear's marriage license mandate here. The Commonwealth statutorily provides that county clerks with conscience or other objections may be excused (*i.e.*, accommodated) from issuing

hunting and fishing licenses. *See* KRS §150.195(2). The Commonwealth makes it automatic for a clerk seeking such an accommodation stating that all clerks "may, at any time during [their] term in office, apply in writing for an exemption from the requirement that he or she sell licenses," and mandates that the commissioner grant the exemption. *Id.*

Thus, the Governor's mandate not only fails neutrality, but it also fails general applicability at numerous levels, and is unconstitutional under the First Amendment unless it satisfies strict scrutiny, which it cannot.

> **2.    The Commonwealth's failure to timely grant Davis a reasonable accommodation for her sincerely held religious beliefs constitutes a substantial burden under Kentucky RFRA.**

The Governor's Mandate forcing Davis to authorize marriage licenses for same-sex couples substantially burdened her religious exercise as protected by Kentucky RFRA. Kentucky RFRA protects a "person's," including Davis's, "right to act or refuse to act in a manner motivated by a sincerely held religious belief," mandating that such person's right "may not be substantially burdened." KRS §446.350. As such, the Kentucky RFRA protects not only a person's beliefs but also a person's actions (or non-actions) and subjugates to the strictest scrutiny any governmental action (be it legislative, regulatory, executive, or judicial action) substantially burdening religiously-motivated actions (or non-actions). As the

Supreme Court noted, RFRAs "operate as kind of a super statute, displacing the operation of other laws." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020).

As shown above, Kentucky marriage law predating *Obergefell* required that "each county clerk" use the same prescribed form to issue a marriage license. KRS §§402.100, 402.110. As county clerk, Davis was provided the form by the KDLA, and she had no local discretion in the composition and requirements of that prescribed form. By legislative enactment predating *Obergefell*, this form included: (1) an "authorization statement of the county clerk issuing the license"; (2) "the signature of the county clerk or deputy clerk issuing the license"; (3) "[a] signed statement by the county clerk or a deputy county clerk of the county in which the marriage license was issued"; and (4) the "the name of the county clerk under whose authority the license was issued." KRS §402.100(1)–(3). Thus, before *Obergefell*, as county clerk, Davis had to include her name, signature, and approval four times on marriage licenses she signed. Even on licenses that she did not sign, the KDLA-approved form required Davis to put her imprimatur on each and every marriage license issued in her county. *Id.*

Governor Beshear unilaterally directed the KDLA to prepare a revised mandatory form in response to *Obergefell*, which the KDLA distributed to county clerks for immediate, mandatory use, without exception. (RE 89-10, PageID ##874-75, ¶¶25–26; RE 92-3, PageID #1673.) The new form provided no opportunity for

county clerks (or their deputy clerks) with religious objections to opt out of participating in endorsement and approval of same-sex marriage. On this new form, as conceived by Governor Beshear and KDLA, the "authorization" or permission to marry (even on licenses she did not personally sign) still unmistakably came from Davis herself. (RE 92-3, PageID, #1675.). As with the old forms, the new KDLA-approved form required Davis to put her imprimatur on each and every marriage license issued in her county. (*Id.*)

But, as shown above, Davis cannot sanction, endorse, and approve a union of two persons which, according to her sincerely held religious beliefs, is not marriage. Coercing Davis to choose between endorsing relationships inconsistent with her beliefs or resigning from her office, as Governor Beshear's Mandate did, burdened Davis's religious exercise as a matter of law.

"[T]he question that RFRA presents [is] whether the [Governor's] mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). Notably, the substantial burden inquiry does not address the "very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* This Court has held that a substantial burden under RFRA is caused whenever the government's action places more than "mere inconvenience" on religious exercise,

*New Doe Child #1 v. Congress of United States*, 891 F.3d 578, 590 (6th Cir. 2018).

As in *Hobby Lobby*, Davis here believes compliance with the Mandate is immoral.

Davis's "belief implicated a difficult and important question of religion and moral

philosophy, namely the circumstances under which it is wrong for a person to

perform an act that is innocent in itself but that has the effect of enabling or

facilitating the immoral act by another." 573 U.S. at 724 As such, forcing Davis to

chose between her religious convictions and following the Commonwealth's

Mandate that she perform an act she views as immoral was a substantial burden. *Id.*

*See also Fulton*, 593 U.S. at 532 (noting that it imposes a substantial burden on

religious convictions for the government to put religious adherent "to the choice"

between their religious beliefs "approving relationships inconsistent with its

beliefs").

    *Fulton* and *Hobby Lobby* plainly require a finding that the Commonwealth's

Mandate on Davis substantially burdened her religious beliefs. There was no dispute

that Davis believed "certification is tantamount to endorsement" as it relates to

marriage licenses. *Fulton*, 593 U.S. at 532. Neither Plaintiffs, the district court, nor

this Court are permitted to cast Davis's belief aside as not "logical" or not

"comprehensible" to conclude that her religious exercise was not burdened. *Id*. There

is no dispute that Davis sincerely believed that her name, signature, and

authorization on marriage licenses would constitute an endorsement of same-sex

relationships, which would violate her religious beliefs. As such, Governor Beshear's Mandate indisputably burdened Davis's religious exercise as a matter of settled law. Simply put, "the Governor's actions substantially burden [Davis's] sincerely held religious practices—and plainly so. Religion motives" Davis's decision. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020).

### B. The Commonwealth's Failure To Timely Grant Davis A Reasonable Accommodation For Her Sincerely Held Religious Beliefs Cannot Survive Strict Scrutiny.

Because the Commonwealth's Mandate substantially burdened Davis's religious convictions in a manner that was neither neutral nor generally applicable, the First Amendment and Kentucky RFRA require a demonstration that the Mandate was (1) supported by a compelling governmental interest, and (2) there were no less restrictive means to accomplish that interest. This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 US. 507, 534 (1997). Indeed, "[t]hat standard is not watered down; it really means what it says." *Tandon*, 593 U.S. at 65.

To meet this burden, the government would have to show it "seriously undertook to address the problem with less intrusive tools readily available to it," meaning that it "considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). And the government

would have to "show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interests, not simply that the chosen route was easier.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (quoting *McCullen*, 573 U.S. at 495). The Commonwealth's treatment of Davis fails that test.

> 1. **The Commonwealth had no compelling interest in refusing to extend reasonable accommodations to Davis's sincere religious beliefs.**

There is no compelling governmental interest in forcing Davis to violate her religious freedom. In *Hobby Lobby*, the Supreme Court emphasized that the similar federal RFRA "contemplates a 'more focused' inquiry" in considering government's purported interests. 573 U.S. at 726. This inquiry "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religions is being substantially burdened," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)), and further requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing" the

marriage license mandate in this case. *See Hobby Lobby*, 573 U.S. at 727 (quoting *O Centro*, 546 U.S. at 431).

The Governor's Mandate was neither expressly nor impliedly compelled by *Obergefell*, and left no room for individual county clerk's religious freedoms under the Kentucky RFRA and First Amendment. Immediately following *Obergefell*, the Governor, on his own initiative, implemented his Mandate based upon a misreading of what the *Obergefell* decision "makes plain." (Mandate, RE 88-3, PageID #744.) In *Obergefell*, the Supreme Court unanimously agreed that First Amendment protections remain despite its creation of a constitutional right to same-sex marriage. The majority noted that "those who adhere to religious doctrines may continue to advocate with utmost, sincere conviction," and that the "First Amendment ensures that religious organizations and persons are given proper protection." 576 U.S. at 680. Moreover, Kentucky RFRA requires that Davis receive statutory protection for her "refusal to act" based on her sincere religious convictions. KRS §446.350.

The Governor was thus under no compulsion to order each and every individual Kentucky County Clerk to authorize and approve same-sex marriage regardless of religious beliefs. Neither the Governor's obtuse refusal to accommodate sincere religious convictions in his Mandate, nor the district court's countenance of it, are supported by a compelling interest.

The refusal to provide Davis a reasonable accommodation for her religious beliefs is not just unsupported by a compelling interest, but the compelling interest favors granting her an accommodation. This Court has found that "[o]ur Nation's history is replete with accommodation of religion." *ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624, 639 (6th Cir. 2005), and the "government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987).

Finally, any purported government interest in enforcing the Mandate without exemption is undermined the Governor's treatment of the Attorney General when he sought accommodation and excuse for his failure to defend Kentucky's laws. (*See supra* Section II.) The Commonwealth's disparate treatment between Davis and the Attorney General "cannot be regarded as protecting an interest of the highest order *when it leaves appreciable damage to that supposedly vital interest unprohibited*." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added) (cleaned up). Where, as here, the Governor permitted exceptions, the Supreme Court has recognized that such exceptions "can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular [individual]." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448 (2015) (cleaned up). "Where a regulation already provides an exception from the law for a particular

group, the government will have a higher burden in showing that the law . . . furthers a compelling interest." *McAllen Grave Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (emphasis added). Thus, because the Commonwealth demonstrated it was willing to make exceptions for some, but not Davis, it demonstrated its Mandate was not supported by a compelling interest.

 2. **The Commonwealth's refusal to grant Davis a reasonable accommodation for her sincere religious beliefs was not the least restrictive means.**

Even if there was a compelling interest in refusing Davis's request for an accommodation, which there is not, the refusal to extend Davis some accommodation must still be the least restrictive means of achieving that interest. "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. Plaintiffs have adduced no evidence that Kentucky "lack[ed] other means" of issuing marriage licenses "without imposing a substantial burden" on Davis's "exercise of religion." *See id.* And, there were abundant alternatives that would have achieved the government's purported interest in effectuating the Supreme Court's decision in *Obergefell* without running roughshod over Davis's constitutionally and statutorily protected religious exercise.

First, the Governor could have modified the KDLA-prescribed form to remove the personal authorization and approval of county clerks. And, there is little doubt that he had the authority to do so given that he announced he could modify the

form at his whim in the moments that followed the release of the Supreme Court's decision in *Obergefell*. (RE 27-1, PageID #138.) Moreover, the Governor effectuated the same change to the form while Davis was incarcerated for exercising her beliefs, and he did so again upon her return to work. (*See* RE 27-4, PageID #134.) And, if the authority of the Governor to grant that accommodation were still in question, which it is not, his successor, Governor Bevin, effectuated the same accommodation on a statewide basis through his Executive Order 2015-048, and the Kentucky legislature did so on a permanent basis by enacting SB 216. (Executive Order, RE 29-1, PageID ##174-176.) There is no reason at all why these less restrictive means could not have been implemented by the Governor *before Davis was incarcerated for exercising her religious beliefs, and before Plaintiffs' cause of action against her accrued*.

Second, the Commonwealth could have designated other persons who are able to issue marriage licenses in a particular county in the event the county clerk has a religious objection to issuing such licenses, structured similarly to the statute that already allows a county judge/executive to issue a marriage license in the absence of the county clerk. *See* KRS §402.240.

Third, the Commonwealth could have provided an opt-out or exemption to county clerks who have a religious objection to issuing marriage licenses to same-sex couples bearing the clerks' names and authorizations. And, it is beyond cavil

that the Commonwealth could have done precisely that since it already does so in the context of hunting and fishing licenses. *See* KRS §150.195(2). And, other states, such as North Carolina, have provided precisely this type of remedy to conscientious objectors to participating in same-sex marriage. *See, e.g.*, N.C. Gen. Stat. §51-5.5.

Fourth, Kentucky could have effected the issuance of marriage licenses at the state-level through an online or other state-wide licensing scheme that removes county clerks as state agents for authorizing and approving licenses. That this option (or any of the other alternatives, for that matter) might have cost the government some expense is irrelevant because "some circumstances may require the government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 573 U.S. at 730.

As demonstrated by the Commonwealth's own statutory scheme, the previous Governor's acceptance of multiple accommodations, Governor Bevin's subsequent executive action to provide Davis an accommodation, and the legislature unanimous adoption of the precise accommodation Davis was requesting, the Commonwealth's failure to grant Davis a simple accommodation for her constitutionally protected religious exercise was not the least restrictive means. The Commonwealth's failure to provide accommodation for Davis fails strict scrutiny. The First Amendment and Kentucky RFRA demanded Davis receive an accommodation, and the district court's refusal to recognize that reality was in error.

**III. THE DISTRICT COURT ERRED BY FINDING THAT *OBERGEFELL* CREATED A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT THAT SUPERCEDED DAVIS'S PRE-EXISTING FUNDAMENTAL, TEXTUAL CONSTITUTIONAL RIGHTS TO RELIGIOUS EXERCISE.**

    **A.    The District Court Erred By Describing The Alleged Right Too Generally.**

The Supreme Court has made clear that courts cannot describe an alleged constitutional right too generally. *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) ("We have repeatedly told courts not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances.")

As this Court has noted, "[t]he level of generality at which the constitutional right in question is defined is of great importance." *Occupy Nashville v. Haslam*, 769 F.3d 434, 443 (6th Cir. 2014); *id.* at 444 ("There must be specificity in the definition of the right at stake."). "In some circumstances, as when an earlier case leaves open whether a general rule applies to the particular type of conduct at issue, *a very high degree a prior factual particularity may be necessary*." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (emphasis added). Indeed, "[t]he Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Occupy Nashville*, 769 F.3d at 443 (quoting *Plumhoff*, 572 U.S. at 779).

42

In *Occupy Nashville*, plaintiffs alleged that their right was the "clearly established First Amendment right to be present on the plaza to air their grievances against the government." *Id.* The officials, however, claimed that the right needed to be more particularized than the general First Amendment right to air grievances, and argued that it must be described with particularity as to the specific situation and circumstances under which the plaintiffs wanted to exercise that right. *Id.* The officials claimed that the right must be described as the right to a "24-hour occupation" of the plaza to engage in their First Amendment rights. *Id.* This Court agreed with the officials, noting that a general assertion of right under a specific amendment is too broad. *Id.*

Here, Plaintiffs alleged that the clearly established right is simply the "right to marry" under the Fourteenth Amendment. (Am. Compl., RE 27, PageID ##121, 124, ¶¶ 21, 43.) This is precisely the type of abstraction that the Supreme Court faced (and rejected) in *Anderson v. Creighton*. 483 U.S. 635 (1987). There, the Supreme Court was presented with allegations that the government official had violated the clearly established right to due process. *Id.* at 639. The operation of whether a government official (including Davis) was liable for alleged violation of Plaintiffs' allegedly clearly established constitutional right, the Court held, "depends substantially upon the level of generality at which the 'legal rule' is to be identified." *Id.* And, Plaintiffs' assertion—and the district court's adoption of that purportedly

clearly established constitutional right (Mem. Op., RE 108, PageID ##1956-1960)—

presented this issue in too general of terms.

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation.

*Anderson*, 483 U.S. at 639.

What Plaintiffs were required to allege, and what the district court was required to find, was an alleged violation of a clearly established constitutional right articulated with *specificity* and *particularity*: Whether Plaintiffs have a clearly established right to obtain a marriage license from a particular government official, in a particular place, on a particular form, without any accommodation for such official's sincerely held religious beliefs. The district court, however, simply said that "*Obergefell* recognizes Plaintiffs' Fourteenth Amendment right to marry." (Mem. Op., RE 108, PageID ##1956.) *Obergefell* did not hold, however, that the right to marry comes with the concomitant (and therefore clearly established) right to receive a particular marriage license signed and solemnized by a particular individual, without any accommodation for sincerely held religious beliefs. "It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been clearly established *in a more particularized*, and hence more relevant, sense." *Anderson*, 483 U.S. at 640.

44

Plaintiffs' "right to marry" was simply too general to adequately address the scope of Davis's actions and their alleged unlawfulness.

**B.** **Regardless Of The Holding Of *Obergefell*, It Was Not Clearly Established In 2015, And It Is Not Clearly Established Now, That *Obergefell*'s Holding Vitiated Textual First Amendment Rights To Free Exercise Of Religion.**

Regardless of the holding of *Obergefell* in relation to same-sex marriage, what is plain is that the decision did not establish the precise contours of that right or its interplay with other clearly established constitutional rights. As the Supreme Court has noted, a particularized articulation of the alleged clearly established right does not, of course, require that in every clearly established inquiry "the very action in question has been previously held unlawful." *Anderson*, 483 U.S. at 640. But, "*is it to say that in light of the pre-existing law the unlawfulness must have been apparent.*" *Id.* (emphasis added). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (emphasis added) (cleaned up). "For a constitutional right to be clearly established, as this Court has repeatedly noted, 'the law must be clear in regard to the official's particular actions *in the particular situation*.'" *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997) (emphasis added) (quoting *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991)). Indeed, "*pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about*), the conclusion for every like-situated,

45

reasonable government agent that what the defendant is doing violates federal law *in the circumstances*. *Id.* (quoting *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc) (emphasis added)).

In deciding whether a constitutional right is clearly established, the Sixth Circuit "'look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)); *see also O'Malley v. City of Flint*, 652 F.3d 662, 667-68 (6th Cir. 2011). "This standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a *fact-specific, case-by-case basis*." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997) (emphasis added) (cleaned up). Where a case arises in an area "in which the result depends very much on the facts of each case," and no case "squarely governs the case here," no clearly established right is demonstrated. *See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004).

It is beyond cavil that the particularized contours of the right *Obergefell* created was not ironed out with sufficient clarity such that the unlawfulness of Davis's actions was readily apparent to even the most casual observer. Far from it. In fact, since the time of *Obergefell*, the Supreme Court has confronted a number of questions that have ironed out the interplay between *Obergefell* and other pre-

existing constitutional rights. *See, e.g.*, *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018) (determining the interplay between the rights of same-sex couples to marry and receive goods and services pertaining to that marriage ceremony with an individual's First Amendment rights to religious expression and exercise); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (same).

In *Masterpiece Cakeshop*, the Court noted—unremarkably—that there are certain circumstances under which an individual is excused from the performance of some other obligation by virtue of his religious beliefs. 584 U.S. at 632. Specifically, as it related to weddings and marriages, the Court noted that there are instances where an individual would refuse to participate in the solemnization of a same-sex wedding on the basis of sincerely held religious beliefs, and that such "refusal would be well understood in our constitutional order as an exercise of religion, an exercise that gay persons could recognize and accept without serious diminishment to their own dignity and worth." *Id.*

And in 2023, five years after *Masterpiece Cakeshop* and eight years after *Obergefell* was decided, the Supreme Court was still defining the precise contours of how *Obergefell* interacted with the First Amendment rights of others. *303 Creative*, 600 U.S. at 588 (determining whether the state had the authority under the First Amendment to "force [an individual] to create custom websites celebrating other marriages she does not [endorse]" for the sole purpose of eliminating

"dissenting ideas about marriage" and "excis[ing] certain ideas or viewpoints from the public dialogue.")

Or, more proximate in time to Davis's question below, take *Pavan v. Smith*, 582 U.S. 563 (2017), where the Supreme Court decided upon the interplay between a statutory question regarding birth certificates and the right created in *Obergefell*. Was it clearly established enough that *Obergefell* perforce required Arkansas to abandon its statute mandating the names of the birth mother and birth father to be listed on the birth certificate? Plainly not, since the Supreme Court took another two years *after Obergefell* to answer that question. Yet, the district court and Plaintiffs below tasked Davis with predicting the future as to how the Court would rule on questions relating to her own constitutional rights. Such is not the law, and holding Davis personally liable for hundreds of thousands of dollars for the exercise of her clearly established conscience rights, because a heretofore unknown right had just been created, ignores long-standing precedent.

As the Supreme Court of Texas noted, "[t]he Court's decision to hear and consider *Masterpiece Cakeshop* illustrates that neither *Obergefell* nor *Pavan* provides the final word on the tangential questions *Obergefell*'s holdings raise but *Obergefell* itself did not address." *Pidgeon v. Turner*, 538 S.W.3d 73, 89 n.22 (Tex. 2017). If, after eight years the Supreme Court is still defining the precise contours of the right established in *Obergefell*, particularly as it relates to the interplay

between that right of same-sex couples and the textual First Amendment rights of religious conscience and exercise for others, then there can be no dispute that there was no clearly established right to force Davis to violate her conscience in 2015.

And, the questions of the interplay between government officials' constitutional right to exercise religion and *Obergefell*'s creation of a right to same-sex marriage are still being discussed and litigated. Less than one month before the filing of the instant brief (and nine years after *Obergefell* was decided), the Supreme Court of Texas was faced with a challenge from a justice of the peace concerning the permissibility of the government forcing her to officiate same-sex wedding against her religious beliefs. *See Hensley v. State Comm'n on Judicial Conduct*, 2024 WL 3210043 (Tex. June 28, 2024). Hensley sought an accommodation for her religious beliefs to not officiate same-sex marriages, and the judicial commission issued her a public reprimand. *Id.* at *1. The Texas Supreme Court permitted her case to proceed as to whether she was entitled to that accommodation. *Id.* at *11. Two justices on the court stated that such an official was entitled to the type of accommodation that Davis sought nine years ago. *See id.* at *11 (Blackslock, J., concurring) ("Judge Hensley's eminently reasonable policy honored her personal convictions and showed courtesy to same-sex couples, who the U.S. Supreme Court has said are entitled to a marriage—*not to a particular marriage officiant, and especially not to an officiant with religious objections to participating in the ceremony*." (emphasis added)).

If the courts across the country are still wrestling with this issue, including the Supreme Court just one year ago, it cannot be gainsaid that Davis was not in violation of a clearly established constitutional right nine years ago. The district court's decision to the contrary was in error and should be reversed.

IV. ***OBERGEFELL*** **SHOULD BE OVERTURNED FOR THE SAME REASONS ARTICULATED BY THE COURT IN *DOBBS*.**[2]

    A. ***Obergefell* Was Wrong When It Was Decided And It Is Wrong Today Because It Was Based Entirely On The "Legal Fiction" Of Substantive Due Process, Which Lacks Any Basis in The Constitution.**[3]

As the Supreme Court noted in *Dobbs v. Jackson Women's Health Organization*, "*stare decisis* is not an inexorable command" and "is at its weakest when we interpret the Constitution." 597 U.S. 215, 264 (2022). "[W]hen it comes to the interpretation of the Constitution—the 'great charter of our liberties,' which was meant to endure through the long lapse of the ages—we place a high value on having

---

[2]     Davis acknowledges that this Court does not have the authority to overrule Supreme Court precedent. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983). Nevertheless, she must present her argument to preserve it. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 56 n.4 (2002).

[3]     *Obergefell* based its recognition of a constitutional right to same-sex marriage under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, but explicitly noted that "the two Clauses converge in the identification and definition of the right" because of the "interlocking nature of these constitutional safeguards." 576 U.S. at 672, 674. Thus, to the extent that *Obergefell* holds that the right to same-sex marriage is protected by the Equal Protection Clause, it was because of its interrelation with the Court's substantive due process analysis. The two theories rise and fall together.

the matter settled right." *Id.* (cleaned up). And, "when one of our constitutional decisions goes astray, the country is usually stuck with the bad decision unless we correct our own mistake." *Id.* Therefore, in appropriate circumstances we must be willing to reconsider, and if necessary, overrule constitutional decisions." *Id.* The Court's decision in *Obergefell*—grounded in the erroneous fiction of substantive due process—is such a decision and the mistake must be corrected. Indeed, three of the "five lawyers who happen[ed] to hold commissions authorizing them to resolve legal disputes" in 2015 and "announce[d]" a right that "has no basis in the Constitution or this Court's precedent," *Obergefell*, 576 U.S. at 687 (Roberts, C.J., dissenting), are no longer so commissioned.

*Obergefell* was "egregiously wrong," "deeply damaging," "far outside the bound of any reasonable interpretation of the various constitutional provisions to which it vaguely pointed," and set out "on a collision course with the Constitution from the day it was decided." *Dobbs*, 597 U.S. at 268. Moreover, *Obergefell*'s "errors do not concern some arcane corner of the law of little importance to the American people," but "usurped the power to address a question of profound moral and social importance that the Constitution unequivocally leaves for the people." *Id.*

As Justice Thomas correctly opined, "historical evidence indicates that 'due process of law' merely required executive and judicial actors to comply with legislative enactments and the common law when depriving a person of life, liberty,

or property." *Id.* at 331 (Thomas, J., concurring). Other interpretations, he continued, merely required that an individual be afforded "the customary procedures to which freemen were entitled by the old law of England." *Id.* But, "[e]ither way, the Due Process Clause at most guarantees *process*." *Id.* "It does not, as the Court's substantive due process cases suppose, forbid the government to infringe certain fundamental liberty interests *at all*, no matter what process is involved." *Id.* (cleaned up). As with abortion in *Dobbs*, "[b]ecause the Due Process Clause does not secure *any* substantive rights, it does not secure a right to [same-sex marriage]," *id.*, and especially not a right to receive a same-sex marriage license from a specific government official, regardless of that individual's religious convictions.

The instant case presents the unique opportunity to revisit the entirety of the "oxymoron" of substantive due process that "lacks any basis in the Constitution." *Id.* Specifically, Davis's appeal demonstrates the need to "reconsider all of th[e] Court's substantive due process precedents, including *Griswold [v. Connecticut]*, *Lawrence [v. Texas]*, and *Obergefell*." *Id.* at 332. The reason for that is simple: "[b]ecause any substantive due process decision is demonstrably erroneous, we have a duty to correct the error established in those precedents." *Id.*

Davis's appeal demonstrates why the "legal fiction" of substantive due process is "particularly dangerous." *Id.* It "exalts judges at the expense of the People from whom they derive their authority," "distorts other areas of constitutional law,"

and is "wielded to disastrous ends." *Id.* at 333-35. Davis sought refuge in the textual

protection of the First Amendment's Free Exercise Clause for an accommodation of

her sincerely held religious beliefs, but *Obergefell* was wielded to land her in a jail

cell—and now subject her to a debilitating money judgment—for seeking protection

in the Constitution's plain text. As Justice Thomas previously opined in this case:

"By choosing to privilege a novel constitutional right over the religious liberty

interests explicitly protected in the First Amendment, and by doing so

undemocratically, the Court has created a problem that only it can fix." *Davis v.*

*Ermold*, 141 S. Ct. 3, 4 (2020) (Thomas, J., concurring). The time has come for a

course correction.

"Davis may have been one of the first victims of th[e] Court's cavalier

treatment of religion in its *Obergefell* decision, but she will not be the last." *Id.* at 3.

Because it was grounded in substantive due process, *Obergefell* has produced

disastrous results for individuals like Davis, who "find it increasingly difficult to

participate in society without running afoul of *Obergefell* and its effect on other

antidiscrimination laws." *Id.* at 3-4. And, until the Court revisits its "creation of

atextual constitutional rights," *Obergefell* "will continue to have ruinous

consequences for religious liberty." *Id.* at 4.

**B.**    **Even If Substantive Due Process Is Not Itself Overturned,** ***Obergefell*** **Should Be, Because The Right To Same-Sex Marriage Is Neither Carefully Described Nor Deeply Rooted In The Nation's History.**

*Obergefell* should also be overturned because—assuming that the substantive due process fiction remains—it failed to follow the "disciplined" inquiry outlined in *Washington v. Glucksberg*, 521 U.S. 702 (1997). *See Dep't of State v. Munoz*, 144 S. Ct. 1812, 1821 (2024). *Glucksberg* requires the Court to "insist on a careful description of the asserted fundamental liberty interest," and "protects only those fundamental rights and liberties which are objectively, deeply rooted in this Nation's history and tradition." *Id.* (quoting *Glucksberg*, 521 U.S. at 720-21). *Obergefell* satisfied neither requirement, and its Fourteenth Amendment Due Process and Equal Protection conclusions should be overturned.

**1.**    ***Obergefell*** **did not even attempt a careful description of the right at issue, but explicitly shirked that requirement.**

In *Obergefell*, the Court did not even attempt to satisfy *Glucksberg*'s primary requirement of *carefully describing* the right at issue. Rather, the *Obergefell* majority explicitly disclaimed any efforts to provide a careful description of the alleged right. *Obergefell* plainly recognized that "*Glucksberg* did insist that liberty under the Due Process Clause must be defined in a most circumscribed manner, with central reference to specific historical practices." 576 U.S. at 671. But, rather than attempt to meet that high bar, the Court discarded it to reach the basis for the so-called right

to same-sex marriage. Specifically, the majority in *Obergefell* stated that while such an arcane "approach may have been appropriate for the asserted right there involved," it was not pertinent to its quest to ascertain a new, heretofore historically unknown right. *Id.* As Chief Justice Roberts put it, *Obergefell* went "out of its way to jettison the careful approach to implied fundamental rights" required by *Glucksberg*." 576 U.S. at 702 (Roberts, C.J., dissenting). The reason for that was simple, the majority in *Obergefell* could find "little support" from the Court's precedent. Simply put, "[n]obody could rightly accuse the majority of taking a careful approach" in determining and describing the alleged fundamental right. *Id.* at 702-03.

2.      ***Obergefell*'s atextual rights creation was not deeply rooted in the Nation's history or traditions.**

*Obergefell* was not grounded in the Nation's history or traditions, nor could it have been because it was not rooted in *any* nation's history or traditions. As Chief Justice Roberts noted, the right that the *Obergefell* majority created out of whole cloth was inconsistent with "the meaning of marriage that has persisted in every culture throughout human history." *Obergefell*, 576 U.S. at 687 (Roberts, C.J., dissenting). Indeed, "marriage has existed for millennia and across civilizations [and] [f]or all those millennia, across all those civilizations, marriage referred to only one relationship: the union of a man and a woman." *Id. See also id.* at 718 (Scalia, J., dissenting) (noting that marriage as the union of a man and a woman was "the

unanimous judgment of all generations and all societies"); *id.* (noting that the majority in *Obergefell* had "discovered in the Fourteenth Amendment a 'fundamental right' overlooked by every person alive at the time of ratification, and almost everyone else in the time since.").

## CONCLUSION

For the foregoing reasons, the judgment and orders of the district court should be reversed.

Respectfully submitted,

/s/ Daniel J. Schmid

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, KY 42502
(606) 677-2741
ACDonahue@donahuelaw-group.com

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Defendant-Appellant Kim Davis*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,999 words, as determined by the word-count function of Microsoft Word 2013, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and this Court's Rule 32(b)(1).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font

|  | /s/ Daniel J. Schmid |
|---|---|
| A.C. Donahue | Mathew D. Staver, *Counsel of Record* |
| DONAHUE LAW GROUP, P.S.C. | Horatio G. Mihet |
| P.O. Box 659 | Daniel J. Schmid |
| Somerset, KY 42502 | LIBERTY COUNSEL |
| (606) 677-2741 | P.O. Box 540774 |
| ACDonahue@donahuelaw-group.com | Orlando, FL 32854 |
|  | (407) 875-1776 |
|  | court@lc.org |
|  | hmihet@lc.org |
|  | dschmid@lc.org |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of July, 2024, I caused a true and correct copy of the foregoing to be electronically filed with this Court. Service will therefore be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Daniel J. Schmid
Daniel J. Schmid

**ADDENDUM**
**Designation of Relevant District Court Documents**
**Pursuant to 6 Cir. R. 28(b)(1)(A)(i) and 6 Cir. R 30(g)(1)(A)-(C)**

| Record Entry No. | Document Description |
|---|---|
| RE 1, PageID #1-7 | Complaint |
| RE 19, PageID #95-97 | *In re: Ashland Civil Actions*: Order |
| RE 20, PageID #98-100 | Notice of Appeal |
| RE 26, PageID #117-118 | Order Granting Plaintiffs Leave to Amend Complaint |
| RE 27, PageID #121- | First Amended Complaint with Jury Demand |
| RE 27-1, PageID #128 | Governor Beshear's June 26, 2015 Letter to Clerks |
| RE 27-2, PageID #129-130 | Kentucky Marriage License |
| RE 27-4, PageID #134-136 | CNN Article, *Kim Davis stands ground, but same-sex couple get marriage license* |
| RE 29-1, PageID #174-177 | Executive Order 2015-048, Relating to the Commonwealth's Marriage License Form |
| RE 49, PageID #294-314 | Memorandum Opinion and Order on Kim Davis's Motion to Dismiss |
| Re 89-5, PageID #853-854 | Article, *Gov. Beshear Tells County Clerks to Fulfill Their Duties or Resign* |
| RE 89-6, PageID #855-857 | WKYT Article, *Jack Conway's Statement on same-sex marriage* |
| RE 89-10, PageID #866-897 | Verified Third Party Complaint of Defendant Kim Davis |

| | |
|---|---|
| RE 89-12, PageID #899 | Kim Davis Letter to Kentucky Senator Robertson |
| RE 89-13, PageID #900 | Kim Davis Letter to Senator Steven Beshear |
| RE 89-14, PageID #901-903 | Motion of Kentucky Senate President, Hon. Robert Stivers for Leave to File Brief as Amicus Curiae |
| RE 89-15, PageID #904-909 | Amicus Curiae Brief of Kentucky Senate President, Hon. Robert Stivers |
| RE 92-3, PageID #1673-1677 | Kentucky Department of Libraries and Archives Email Memorandum to Clerks and Modified Marriage Form |
| RE 108, PageID #1948-1969 | Memorandum Opinion and Order |
| RE 136, PageID #2037 | Plaintiffs' Proposed Special Verdict Form |
| RE 166, PageID #2590 | Judgment |
| RE 167, PageID #2591-2638 | Trial Transcript, Jury Trial Day 1, September 11, 2023 |
| RE 169, PageID #2769-2937 | Trial Transcript, Jury Trial Day 2, September 12, 2023 |
| Re 170, PageID #2938-3064 | Trial Transcript, Jury Trial Day 3, September 13, 2023 |
| RE 175, PageID #3125-3130 | Memorandum Opinion and Order denying Kim Davis's Renewed Motion for Judgment as a Matter of Law |