RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0049p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

DAVID ERMOLD; DAVID MOORE,

*Plaintiffs-Appellees*,

*v.*

No. 24-5524

KIM DAVIS, individually,

*Defendant-Appellant*.

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:15-cv-00046—David L. Bunning, District Judge.

Argued:  January 30, 2025

Decided and Filed:  March 6, 2025

Before: WHITE, READLER, and MATHIS, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:**  Mathew D. Staver, LIBERTY COUNSEL, Orlando, Florida, for Appellant. William Powell, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., for Appellee.  **ON BRIEF:**  Mathew D. Staver, Daniel J. Schmid, LIBERTY COUNSEL, Orlando, Florida, A.C. Donahue, DONAHUE LAW GROUP, P.S.C., Somerset, Kentucky, for Appellant.   William Powell, Kelsi Brown Corkran, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., Michael J. Gartland, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, Joseph D. Buckles, BUCKLES LAW OFFICE, Lexington, Kentucky, for Appellee.

WHITE, J., delivered the opinion of the court in which MATHIS, J., concurred, and READLER, J., concurred in part and concurred in the judgment.  READLER, J. (pp. 20–23), delivered a separate concurring opinion.

————————————

## OPINION

————————————

HELENE N. WHITE, Circuit Judge.  Defendant-Appellant Kim Davis, in her capacity as the clerk of Rowan County, Kentucky, refused to issue a marriage license to Plaintiffs-Appellees David Moore and David Ermold.  Plaintiffs sued Davis under 42 U.S.C. § 1983, claiming that Davis violated their constitutional right to marry.  After several interlocutory appeals, the district court entered judgment for Plaintiffs on liability and a jury awarded them compensatory damages.  Davis now appeals, arguing that she is entitled to qualified immunity, that she has affirmative defenses to liability under the Free Exercise Clause and the Kentucky Religious Freedom Restoration Act, and that Plaintiffs' evidence of their emotional distress was insufficient to support the jury's award.  We AFFIRM.

## I.  Background

In June 2015, when the Supreme Court held that same-sex couples have a constitutional right to marry, *Obergefell v. Hodges*, 576 U.S. 644 (2015), Defendant-Appellant Kim Davis was the elected county clerk for Rowan County, Kentucky.  Kentucky county clerks were charged with providing licenses to county residents, including vehicle licenses, hunting licenses, and marriage licenses.

Soon after *Obergefell* issued, then-Governor of Kentucky Steve Beshear sent a letter to all Kentucky county clerks, including Davis, instructing them to immediately "license and recognize the marriages of same-sex couples."  Davis, however, is religiously opposed to same-sex marriage, and did not want to issue marriage licenses to same-sex couples.  After Davis received and read Beshear's letter, she consulted with the Rowan County attorney, who advised her that she had to issue marriage licenses to same-sex couples "because that's the law."  R. 88-2, PID 742–43.  Davis chose not to follow that advice.  Believing that she should not discriminate, Davis decided that her office would cease issuing marriage licenses altogether until the state passed legislation to grant her an accommodation.  Under this moratorium policy, Davis and her deputies denied marriage licenses to several local same-sex couples.

Plaintiffs-Appellees David Moore and David Ermold are one such couple.  On July 6, 2015, ten days after the Supreme Court published *Obergefell*, Moore and Ermold, who had been in a relationship for nineteen years, visited the Rowan County Clerk's office seeking a marriage license.  Davis refused to issue one, stating that she was acting "under God's authority."  *Id.* at 739.  Davis advised Plaintiffs to obtain a marriage license from a clerk's office in another county.  When Plaintiff Moore remarked that Davis had likely given marriage licenses to "murderer[s], rapists, and people who have done all kinds of horrible things," Davis responded, "that was fine because they were straight."  R. 169, PID 2785–86.

Plaintiffs filed this lawsuit several days later.  They sought damages under 42 U.S.C. § 1983, alleging that Davis violated their constitutional right to marry.  Around the same time, a group of county residents led by April Miller sued Davis in a parallel suit before the same district-court judge, seeking an injunction to prevent Davis from enforcing her no-marriage-license policy.  *Miller v. Davis*, 123 F. Supp. 3d 924, 929 (E.D. Ky. 2015), *vacated*, 667 F. App'x 537 (6th Cir. 2016) (order).  The district court entered a preliminary injunction in the *Miller* case and ordered Davis to issue marriage licenses.  *Id.* at 944.  Plaintiffs Moore and Ermold returned to the Rowan County Clerk's office for a second and third time over the next few weeks seeking a marriage license.  Each time, Davis and her deputies refused.

In September 2015, the district court found that Davis had violated its preliminary injunction by continuing to refuse to issue marriage licenses.  The court held Davis in contempt and ordered her incarcerated.  *See* Min. Entry Order, *Miller v. Davis*, No. 0:15-cv-00044 (E.D. Ky. Sept. 3, 2015), ECF No. 75.  Moore and Ermold returned to the Rowan County Clerk's office while Davis was in jail and obtained a marriage license from one of Davis's deputies.  Meanwhile, Davis appealed the preliminary injunction issued in the *Miller* suit.  *See Miller*, 667 F. App'x at 538.

While that appeal was pending, Kentucky passed a law intended to provide an accommodation to county clerks who opposed same-sex marriage.  *See* 2016 Ky. Acts 578. S.B. 216.  The law still required county clerks to issue marriage licenses, but it removed the clerks' names and signatures from the license forms.  *Id.*  Finding this accommodation sufficient, Davis ended her no-marriage-license policy and moved to dismiss the *Miller* appeal as moot.

Appellant's Motion to Dismiss, *Miller v. Davis*, Nos. 15-5880 and 15-5978 (6th Cir. June 21, 2016). This court granted that motion with agreement from the *Miller* plaintiffs. *Miller*, 667 F. App'x at 538. The district court then dismissed this case as well, believing that both were moot. Plaintiffs Moore and Ermold appealed, and this court reversed and remanded, holding that this case was not moot because Plaintiffs sought damages. *Ermold v. Davis*, 855 F.3d 715, 720 (6th Cir. 2017).

On remand, Plaintiffs amended their complaint, and Davis moved to dismiss. Davis argued that the claim against her in her official capacity was barred by sovereign immunity, and the claim against her in her personal capacity was barred by qualified immunity. The district court agreed in part. It dismissed the official-capacity claim on sovereign-immunity grounds, but declined to dismiss the individual-capacity claim, holding that Plaintiffs had pled sufficient facts to show the violation of a clearly established right.

Both parties appealed,[1] and this court affirmed in all respects and remanded. *See Ermold v. Davis*, 936 F.3d 429 (6th Cir. 2019). We held that sovereign immunity barred the official-capacity claim "[b]ecause Davis acted on Kentucky's behalf when issuing (and refusing to issue) marriage licenses." *Id.* at 435. As for qualified immunity, we agreed that Plaintiffs had pled the violation of a clearly established right. *Id.* "For a *reasonable* official, *Obergefell* left no uncertainty." *Id.* at 436. But "[f]or Davis," "the message apparently didn't get through." *Id.*

After discovery on remand, Plaintiffs moved for summary judgment on their § 1983 claim. Davis also sought summary judgment and re-asserted her qualified-immunity defense. She additionally argued that even if she is not entitled to qualified immunity, she has independent defenses to liability under the Free Exercise Clause of the First Amendment and Kentucky's Religious Freedom Restoration Act (RFRA).

The district court granted summary judgment to Plaintiffs on Davis's liability and held that a jury must decide whether Plaintiffs are entitled to damages. The district court denied Davis's cross-motion, noting that Davis's qualified-immunity arguments were "recycled from

---

[1]When Davis appealed the qualified-immunity ruling, the district court granted Plaintiffs' request for a certificate of appealability so that this court could consider both the sovereign-immunity defense and the qualified-immunity defense in the same appeal.

her Motion to Dismiss briefing." R. 108, PID 1953. The district court also rejected Davis's Free Exercise Clause and Kentucky RFRA defenses. The court found "no example, nor ha[d] Davis provided one, where a defendant's constitutional rights were found to be a valid defense for violating the constitutional rights of others." *Id.* at 1963.

Davis appealed, and this court again affirmed, explaining that "discovery proved the facts plaintiffs pleaded," so Davis was "still not entitled to qualified immunity." *Ermold v. Davis*, No. 22-5260, 2022 WL 4546726, at *1 (6th Cir. Sept. 29, 2022). Beyond that, we declined to consider Davis's Free Exercise and Kentucky RFRA defenses because the interlocutory appeal was limited to qualified immunity, which is unrelated to "whether [Davis] has an affirmative free exercise defense under the First Amendment for her decision not to issue marriage licenses." *Id.* at *3 (quotations omitted). Rather, that defense "can be effectively reviewed after a final judgment." *Id.* (quotation omitted).

On remand, the district court held a trial on damages, at which Plaintiffs Ermold and Moore testified. The jury awarded $50,000 in compensatory damages to each Plaintiff. Davis moved post-trial for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing that Plaintiffs had presented insufficient evidence of their emotional distress to warrant a damage award. The district court denied the motion, finding that "[a] jury could, and did, reasonably infer from the testimony the emotional damage suffered and awarded a sum accordingly." R. 175, 3125–30. This appeal followed.

## II. Analysis

### A. Qualified Immunity

Davis argues that she is entitled to qualified immunity because she did not violate any right that *Obergefell* "clearly established." Appellant's Brief at 42–50. This court has rejected that argument twice—first on Davis's appeal at the motion-to-dismiss stage, *see Ermold*, 936 F.3d at 435, and again on Davis's appeal at the summary-judgment stage, *see Ermold*, 2022 WL 4546726, at *2. Plaintiffs argue that the law-of-the-case doctrine bars this court from reconsidering qualified immunity.

No. 24-5524                          *Ermold, et al. v. Davis*                          Page 6

Under the law-of-the-case doctrine, a court "should not reconsider" a legal issue it "resolved" at a prior stage of the same case. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (quotation marks omitted). In other words, when the "*same* issue" is presented "in the *same case*" to the "*same court*," the "*same result*" should follow. *Id.* (quoting *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012)). The doctrine thus "encourage[s] efficient litigation" and "deter[s] indefatigable diehards." *Id.* at 740 (quotation marks omitted). Indeed, without it, "an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (Gorsuch, J.). Thus, only in "exceptional circumstances" will this court reconsider a legal issue decided by a prior panel in the same case. *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021).

Applying those principles here, the law-of-the-case doctrine dictates that we refrain from reconsidering Davis's qualified-immunity defense. This court has already decided all legal issues involved in that defense. In the first appeal, we held that Plaintiffs "adequately alleged the violation" of their right to marry—a right that "was clearly established when Davis acted." *Davis*, 936 F.3d at 435. In the second appeal, we held that "discovery proved the facts plaintiffs pleaded," so Davis was "still not entitled to qualified immunity." *Davis*, 2022 WL 4546726, at *1. Qualified immunity has been decided twice by the same court in the same case—so the "*same result*" should follow this time. *Howe*, 801 F.3d at 739 (quotation marks omitted).

Nor has Davis identified any "exceptional circumstances" to warrant departing from the law-of-the-case doctrine. *See Daunt*, 999 F.3d at 308. There are three circumstances in which this court may disturb a prior panel's ruling in the same case: (1) "where substantially different evidence" is discovered between appeals, (2) where the "controlling" legal precedent changes between appeals, and (3) "where a decision is clearly erroneous and would work a manifest injustice." *Id.* (cleaned up). No such circumstances are present here. Davis points to no "different evidence" unearthed since her last appeal. *Id.* (quotation marks omitted). Nor has the relevant legal precedent changed; *Obergefell* remains controlling. And although Davis claims that denying qualified immunity "would be a manifest injustice," she supports that assertion only

by repeating the same arguments this court has already rejected.  Appellant's Reply Brief at 23–25.

Indeed, accepting Davis's position would likely work injustice *in the other direction*: Plaintiffs have spent nearly six years litigating this case in reliance on our holding that if they prove the facts alleged in their complaint, Davis would not be entitled to qualified immunity. *Davis*, 936 F.3d at 435–37.  It would be unfair to reverse course now—after Plaintiffs prevailed at trial—and hold that their case was doomed from the start.  The law-of-the-case doctrine exists precisely to prevent that sort of "extended game of litigation whack-a-mole."  *Entek*, 840 F.3d at 1242.

Davis's contrary arguments are unpersuasive.  First, Davis argues that the district court's "interlocutory decisions" merged into the final judgment she has appealed here.  Appellant's Reply Brief at 19–21.  Thus, in her view, this court may freely review any order the district court issued during the litigation.  That argument misunderstands how the law-of-the-case doctrine works.  Of course, the doctrine does not prevent a circuit court from "assess[ing] a lower court's rulings."  *Musacchio v. United States*, 577 U.S. 237, 245 (2016) (citation omitted).  "An appellate court's function *is* to revisit matters decided in the trial court," and the law-of-the-case doctrine does not invert the judicial norm such that a circuit court is "bound by district court rulings."  *Id.*  Rather, the doctrine requires consistency only between decisions issued by the "*same* court."  *Howe*, 801 F.3d at 739 (quotation marks omitted).  So although the doctrine does not hold a circuit court to the district court's decisions, it does hold a circuit court to "a ruling that it made in a prior appeal in the same case."  *Musacchio*, 577 U.S. at 245.  Here, Plaintiffs do not argue that the law of the case bars this court from reviewing the district court's qualified-immunity orders.  Rather, they argue that this court *already* reviewed those orders (twice), and that this panel ought not engage in the same review for a third time.  Plaintiffs are correct.

Second, Davis argues that the law-of-the-case doctrine "does not apply post-final judgment" and thus, because the district court has issued a final judgment below, this court is now free to "chang[e] its earlier decisions."  Appellant's Reply Brief at 21–22.  This argument rests on several out-of-context quotations in which courts have discussed the relationship between a final judgment and the law of the case.  Davis notes, for instance, that courts have

stated that "[l]aw of the case is not synonymous with preclusion by final judgment," and that the doctrine "regulate[s] judicial affairs *before final judgment*."  Appellant's Reply Brief at 22 (quoting *Pit River Home & Agr. Ass'n v. United States*, 30 F.3d 1088, 1097 (9th Cir. 1994); *Patterson v. Haskins*, 470 F.3d 645, 661 (6th Cir. 2006)).

These statements of law are correct, but the inferences Davis draws from them are not. There is no authority for the proposition that an appellate court can freely ignore its ruling in a prior appeal in the same case simply because the district court issued a final judgment between appeals.  And Davis's selected quotations merely illustrate the general rule that the law-of-the-case doctrine applies only to judicial decisions issued "within a single action."  18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478 (3d ed.2024) (Wright & Miller).  In other words, a case ends once the district court issues a judgment resolving all claims by all parties, and all appeals of that judgment conclude.  From that point forward, the law-of-the-case doctrine does not apply because "the case" is over.  *See, e.g.*, *id.* And the preclusive effect that the final judgment may have "on later courts and cases" is governed by "[o]ther doctrines," "such as stare decisis, res judicata, and the mandate rule." *Edmonds v. Smith*, 922 F.3d 737, 740 (6th Cir. 2019).  That is why it has been said that law of the case "regulate[s] judicial affairs before final judgment," *see, e.g.*, Wright & Miller § 4478— because the doctrine no longer applies after appeals of the final judgment are resolved.  Davis's cited quotations do not stand for the proposition that a circuit court may disregard its interim interlocutory decisions once the district court enters a final judgment.[2]

---

[2]Even if we were not bound by the law of the case and could properly entertain Davis's assertion of qualified immunity, Davis's argument is weak.  Qualified immunity protects government officials from personal liability so long as they do not violate a plaintiff's "clearly established" constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).  The defense ensures that an official facing a claim asserting the violation of a constitutional right had "fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  An official has fair notice where it is clear that her "particular conduct" was unconstitutional. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  In making that determination, we do not define a right at "a high level of generality." *Id.*  Davis argues that *Obergefell* did not establish a constitutional right to same-sex marriage with the specificity needed to put her on notice that her acts were unconstitutional.  We disagree.  The "particular conduct" for which Davis is being held liable is her decision—in her capacity as a state official—to deny Plaintiffs a marriage license.  And in *Obergefell*, the Supreme Court held that "States are required by the Constitution to issue marriage licenses to same-sex couples."  576 U.S. at 680; *see also id.* at 687 (Roberts, C.J., dissenting) (recognizing that the Court "order[ed] every State to license and recognize same-sex marriage").  Indeed, one set of Plaintiffs in *Obergefell* was a same-sex couple from Kentucky who sued state officials and argued that "the Fourteenth Amendment requires a State to license a marriage between two people of the same sex." *Id.* at 654–

**B.  Other Affirmative Defenses**

Davis alternatively argues that if she is not entitled to qualified immunity, she has a "defense to liability" under the Free Exercise Clause of the First Amendment and Kentucky's RFRA.  As Davis sees it, issuing Plaintiffs a marriage license would have violated her own constitutionally protected religious beliefs; thus, she asserts, she cannot be held liable.  We disagree.

> **1.  Davis cannot raise a Free Exercise Clause defense because she is being held liable for state action, which the First Amendment does not protect.**

Davis first argues that the Free Exercise Clause provides her an affirmative defense to liability.  She analogizes this case to *New York Times v. Sullivan*, 376 U.S. 254 (1964), and other cases in which the Supreme Court has held that the First Amendment can be a defense to tort claims.  Plaintiffs respond that the Free Exercise Clause protects private conduct, not government action, and because Davis denied Plaintiffs a marriage license while "acting in her role as a government official," the denials are not protected by the First Amendment.  Appellee's Brief at 41–46.  The district court agreed, holding that "Davis's conscientious religious objection to same-sex marriage outside of her official duties" does not shield her from the constitutional violations she commits when "acting under color of state law."  R. 108, PID 1962.

This appears to be an issue of first impression.  The parties have provided no case in which a government official raised a First Amendment affirmative defense to a § 1983 claim.  The district court likewise noted that it found "no example" of such a case.  *Id.* at 1963.

Although Davis's assertions are novel, they fail under basic constitutional principles.  Under § 1983, Davis is being held liable for state action, which the First Amendment does not protect—so the Free Exercise Clause cannot shield her from liability.  The First Amendment protects "private conduct," not "state action."  *Lindke v. Freed*, 601 U.S. 187, 196–97 (2024); *see also, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) (the First

---

56.  This court "held that a State has no constitutional obligation to license same-sex marriages," *id.* at 656 (citing *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014)), but the Supreme Court reversed and held the opposite.  Thus, after *Obergefell*, no reasonable state official could claim to lack notice that it is unconstitutional to refuse to "issue marriage licenses to same-sex couples."  *Id.* at 680.

Amendment "constrains" the government and "protects" private acts). To be sure, not every act taken by a public official constitutes state action unprotected by the First Amendment. *Lindke*, 601 U.S. at 191. Government officials "have private lives and their own constitutional rights." *Id.* at 197. But when a public official wields the "authority of the state," she "engage[s] in state action," which, by definition, cannot be protected by the First Amendment. *Id.* at 196–98.

A recent Supreme Court case illustrates these principles. In *Lindke v. Freed*, an elected city manager maintained a Facebook page in his name. *Id.* at 193. One of his constituents began posting negative comments about the city government on the Facebook page, and the city manager responded by blocking the constituent and deleting the comments. *Id.* The constituent sued under § 1983, alleging that the city manager had violated his First Amendment rights. *Id.* Unlike Davis, the city manager did not attempt to raise a First Amendment defense, but the Court explained that constitutional rights were at stake for both parties. On one hand, the First Amendment bars the government from silencing those who criticize it, so the constituent had a First Amendment right not to be blocked by public officials online. *Id.* at 191, 196–97. On the other hand, the First Amendment generally protects a person's right to control the content on his social-media profile—so the city manager may have had a First Amendment right to block unfriendly users from his Facebook page. *Id.* at 197. The Court explained that the key to adjudicating these competing rights is "[t]he distinction between private conduct and state action." *Id.* When a public official "function[s] as a private citizen," he may "exercise[] his own" constitutional rights. *Id.* at 196–97. But when he "engage[s] in state action," he can be liable in his individual capacity under § 1983 for violating another person's constitutional rights. *Id.* at 195–98 & n.1. The Court thus held that the city manager could be liable if he engaged in state action "when he blocked [the constituent] and deleted his comments." *Id.* at 197.

Just so here. The First Amendment shields Davis where she "functioned as a private citizen," but not where she "engaged in state action." *See id.* at 196–97. That binary is outcome-determinative here because the act for which Davis is being held liable—denying Plaintiffs a marriage license—is quintessential state action. A state official engages in state action when she "possesse[s] state authority" and "purport[s] to act under that authority." *Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (quotations omitted). So too where she exercises power that is

"possible only because" she is "clothed with the authority of state law." *Lindke*, 601 U.S. at 198 (quotations omitted). In Kentucky, marriage licenses are issued by the government; a private party has no authority to grant or deny a marriage license to anyone. And Kentucky delegated that licensing authority to county clerks, who are charged with "issuing marriage licenses, recording marriage certificates, and reporting marriages." *Davis*, 936 F.3d at 434 (citing Ky. Rev. Stat. §§ 402.080, 403.220, 402.230). So, when Davis denied Plaintiffs a marriage license, she was wielding the "authority of the State"—not "function[ing] as a private citizen." *Lindke*, 601 U.S. at 197. That means the license denials were "state action," *id.*, which cannot receive First Amendment protection, and Davis cannot raise a First Amendment defense to liability.

Davis alternatively argues that *her* Free Exercise rights were violated by a *different* state action: Kentucky's delay in granting her a religious accommodation. But Plaintiffs had nothing to do with the timing of the accommodation, and Davis's argument is irrelevant to Plaintiffs' claim. Either way, Davis has been found liable for state action—not private conduct—so she cannot raise a First Amendment defense. Indeed, that is likely why Davis has not found a case in which a government official has raised a successful First Amendment defense to a § 1983 claim. Section 1983 applies only to acts taken "under color of" state law—a synonym for "state action." *Lindke*, 601 U.S. at 195–96. Simply put, the First Amendment does not protect conduct to which § 1983 applies.

For similar reasons, Davis is mistaken to rely on *New York Times v. Sullivan* and its progeny. Those cases involve *private* defendants being sued for *private* conduct—e.g., a newspaper being sued for an editorial advertisement, *see New York Times*, 376 U.S. at 265, or a church leader being sued for protesting a funeral, *see Snyder v. Phelps*, 562 U.S. 443 (2011). The First Amendment protects such private conduct, so the Court recognized a First Amendment defense to prevent state tort law from imposing "invalid restrictions" on "constitutional freedoms." *New York Times*, 376 U.S. at 265. But that logic is inapposite here because the First Amendment does not shield exercises of state power, even where that power is exercised by individuals, so there are no "constitutional freedoms" to protect.

At oral argument, Davis's counsel insisted that Davis is no different from a private defendant in a case like *New York Times* because she is being sued in her individual

capacity and has been denied qualified immunity. This conflates two legal concepts and is incorrect. A § 1983 individual-capacity claim seeks to impose personal liability on a government official for actions she takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Such state actions are not protected by the First Amendment, regardless of the capacity in which the defendant is sued or whether the defendant is entitled to qualified immunity. Indeed, like Davis, the defendant in *Lindke* was sued in his individual capacity, 601 U.S. at 195 n.1, but the Court still held that he could be liable under § 1983 if he wielded "the State's power or authority," *id.* at 198. By definition, a § 1983 claim requires that the defendant engage in state action. Qualified immunity, on the other hand, is a "personal immunity defense[]," *Graham*, 473 U.S. at 166, that "operates to ensure that . . . [officials] are on notice their conduct is unlawful," *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). It comes into play only as a defense to a § 1983 claim, which requires state action. Davis's failure to establish that defense means only that she knew, or should have known, her conduct was unlawful; it does *not* transform her unconstitutional state action into constitutionally protected private conduct.

*Obergefell* itself supports this conclusion. There, the Court acknowledged that many people "deem same-sex marriage to be wrong" based on "religious or philosophical premises." *Obergefell*, 576 U.S. at 672. These people retain the First Amendment right "to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Id.* at 679. But those opposed to same-sex marriage do not have a right to transform their "personal opposition" into "enacted law and public policy." *Id.* at 672. Put differently, opposition to same-sex marriage cannot constitutionally bear "the imprimatur of the State itself." *Id.*

Davis's contrary view would subvert the Bill of Rights. As Davis sees it, a public official can wield the authority of the state to violate the constitutional rights of citizens if the official believes she is "follow[ing] her conscience." Appellant's Brief at 26. That cannot be correct. "The very purpose of a Bill of Rights" is to place certain freedoms "beyond the reach of . . . [government] officials." *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943). Thus, when an official's discharge of her duties according to her conscience violates the constitutional

rights of citizens, the Constitution must win out. The Bill of Rights would serve little purpose if it could be freely ignored whenever an official's conscience so dictates.

Indeed, it is not difficult to imagine the dire possibilities that might follow if Davis's argument were accepted. A county clerk who finds interracial marriage sinful could refuse to issue licenses to interracial couples. An election official who believes women should not vote could refuse to count ballots cast by females. A zoning official personally opposed to Christianity could refuse to permit the construction of a church. All these officials would have wielded state power to violate constitutional rights—but they would have followed their conscience, which Davis believes provides a "defense to liability." Reply Brief at 13.

That is not how the Constitution works. In their "private lives," *Lindke*, 601 U.S. at 196, government officials are of course free to express their views and live according to their faith. But when an official wields state power against private citizens, her conscience must yield to the Constitution.

## 2. Kentucky RFRA does not provide a defense to liability under § 1983.

Davis also argues that Kentucky's RFRA shields her from liability. But that statute does not apply here. This court has held that the federal RFRA statute "does not apply in suits between private parties." *Gen. Conf. Corp. v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010). Under federal RFRA, the government may substantially burden religious exercise "only if it demonstrates" that the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(b). But the government cannot make this demonstration if it "is not a party" to the case. *McGill*, 617 F.3d at 410 (quotations omitted). By creating a statutory framework under which "the government must make a showing," *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015), Congress plainly "did not intend the statute" to apply when the government is not a party, *McGill*, 617 F.3d at 411.

The same logic applies to Kentucky's RFRA. That statute similarly requires the state government to "prove[] by clear and convincing evidence that it has a compelling governmental interest," and "has used the least restrictive means." Ky. Rev. Stat. § 446.350. Of course, the state government cannot prove anything by any evidentiary standard if it "is not a party" to the

case.  *McGill*, 617 F.3d at 410 (quotations omitted).  Kentucky is not a party here, so Kentucky's RFRA does not apply.

Davis asserts that in *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court "called into doubt" this court's holding that Federal RFRA does not apply in suits between private parties.  Reply Brief at 18 n.2.  In *Bostock*, the Supreme Court held that Title VII bars an employer from discriminating against an employee "simply for being homosexual or transgender."  *Id.* at 651.  At the end of the opinion, the Court noted that RFRA "might supersede Title VII's commands in appropriate cases"—although it ultimately left that question for a "future case[]."  *Id.* at 682.  That vague dicta did not displace this court's holding that RFRA does not apply where the government is not a party.  *McGill*, 617 F.3d at 412.  Indeed, the *Bostock* dicta is not even inherently inconsistent with this court's holding because Title VII can be enforced by the EEOC, *see, e.g.*, *EEOC v. Ferrellgas, L.P.*, 97 F.4th 338 (6th Cir. 2024), so the "appropriate cases" in which RFRA could provide a defense to Title VII claims may be the cases in which a government agency is a party.

Further, this case does not involve a Title VII claim; it involves a § 1983 claim alleging the violation of constitutional rights.  Even if Davis is right that Kentucky's RFRA can somehow displace the normal operation of federal statutes, it certainly cannot displace the operation of federal constitutional rights.  Perhaps for that reason, Davis has provided no case in which a court has recognized a RFRA defense to a § 1983 claim.

## C.  Damages

### 1.  The district court correctly denied Davis's motion for judgment as a matter of law.

Davis argues that Plaintiffs "failed to offer competent evidence of damages," and that the district court thus erred in denying her motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  Appellant's Brief at 15.  This court reviews the denial of a Rule 50(b) motion de novo.  *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1072 (6th Cir. 2014).  In doing so, the court is "deferential" to the jury's conclusion and does not "weigh the evidence, question the credibility of the witnesses, or substitute our judgment for that

of the trier of fact." *Id.* (citation omitted). Reversal is appropriate only if no "reasonable mind[]" could agree with the jury's verdict when viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in the non-moving party's favor. *Id.* (citation omitted).

"[M]ental and emotional distress constitute compensable injury in § 1983 cases." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (citation omitted). To be sure, emotional-distress damages are inherently "subjective," but a jury may properly award such damages where a plaintiff shows "the nature and circumstances of the wrong and its effect." *Carey v. Piphus*, 435 U.S. 247, 264 & n.20 (1978). And emotional distress need not be "severe," "outrageous," or "extreme" to warrant damages; so long as "any harm is shown," "damages proportionate to that harm should be awarded." *Chatman v. Slagle*, 107 F.3d 380, 384–85 (6th Cir. 1997). Thus, this court will not disturb a jury's award of emotional-distress damages unless the testimony regarding the plaintiff's emotional distress is "merely conclusory." *Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 611 (6th Cir. 2016). For example, we held that judgment for the defendant was appropriate where the "only proof of emotional harm" at trial was the plaintiff's bare statement that he was "highly upset." *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1259 (6th Cir. 1985). On the other hand, judgment for the defendant is not appropriate if the plaintiff "explain[s] the circumstances surrounding [his] emotional injuries," such that a jury could find that "a reasonable person in the same situation would suffer emotional distress." *Smith*, 837 F.3d at 611 (cleaned up).

In *Smith*, a faulty background check caused an employer to incorrectly believe that a prospective employee was a felon, resulting in a six-week delay in his start date. *Id.* at 607. The employee testified that the hiring delay caused him to "fall on hard times," which made him feel "depressed" and "down in the dumps." *Id.* at 608, 611. His wife "corroborated" these assertions, testifying that her husband was "a bit angry about not being able to pay the bills" and "depressed that he couldn't provide for his family." *Id.* at 608. After the jury awarded more than $72,000 in emotional-distress damages, the background-check servicer moved for judgment under Rule 50(b), arguing—as Davis does here—that the evidence of damages was "not sufficient." *Id.* at 611. This court affirmed the district court's denial of the motion, holding that

the testimony was more than "merely conclusory," and adequately "describe[d] [the employee's] shame, anger, and stress." *Id.* The plaintiff's situation was one "with which reasonable jurors could identify," and a jury could "infer that a reasonable person in the same situation would suffer emotional distress." *Id.*; *see also Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (affirming the denial of judgment for the defendant because several witnesses testified that the plaintiff was, among other things, "upset and frightened"); *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F.2d 201, 210 (6th Cir. 1990) (affirming the denial of judgment for the defendant where the plaintiff "testified that he was shocked and humiliated, and he explained why," and his wife corroborated the testimony).

Under these standards, Plaintiffs presented enough evidence to sustain the jury's verdict. They testified extensively about the "circumstances surrounding their emotional injuries." *Smith*, 837 F.3d at 611 (internal quotation marks omitted). When Plaintiffs first attempted to obtain a marriage license, they got into "an argument" with Davis at the clerk's office because Davis "was saying . . . she didn't want to give [licenses] to gay people." R. 169, PID 2785. When Plaintiff Moore remarked that Davis had given marriage licenses to "murderer[s], rapists, and people who have done all kinds of horrible things," Davis responded, "that was fine because they were straight." *Id.* at 2785–86. This interaction made Moore feel like he was "a second class citizen," "less than a person," "just a dog," and "subhuman." *Id.* at 2785–86, 2812. And Plaintiff Ermold felt "disgusted" and "humiliated." *Id.* at 2818–19.

Davis advised Plaintiffs that they could get their marriage licenses in another county, but that comment only compounded the stigma. Moore "wanted to get a license in [his] home county," not elsewhere. *Id.* at 2787–89. As he explained, "[n]o one's ever said, [g]o to another county and get your car tags" or "[g]o to another county and pay your property taxes." *Id.* at 2787–88. But when it came to their marriage license, Plaintiffs were told to "go someplace else." *Id.* at 2789.

These emotional harms grew as Davis denied Plaintiffs a marriage license on two more occasions. Moore got "more frustrated and more frustrated." *Id.* at 2790. He was "pretty upset" and "screaming." *Id.* Ermold had "a lot of stress and anxiety." *Id.* at 2824. He still thinks about the events of this case "[e]very day"—it is one of the "most difficult thing[s]" he has ever

experienced. *Id.* at 2823–24, 2829. Ermold testified that Davis "tainted" Plaintiffs' wedding. *Id.* at 2816. And Plaintiffs' marriage is so intertwined with the license denials that Moore sees Davis's face when he looks at his wedding pictures. *See also id.* at 2797 (Moore testifying, "it's distorted your whole life forever. You're just going to have those memories forever, have to think about that forever.").

As *Obergefell* explained, denying same-sex couples a right to marry "demeans" and "stigmatizes" them, "diminish[es] their personhood," and "subordinate[s] them." 576 U.S. at 670, 672, 675. Davis caused Plaintiffs to suffer these indignities three times and did so while implying that Plaintiffs were inferior to murderers and rapists. Given the sense of stigma and powerlessness Davis's actions caused, a reasonable jury could find that "a reasonable person in the same situation" as Plaintiffs "would suffer emotional distress." *Smith*, 837 F.3d at 611.

Davis's counterarguments are unpersuasive. She relies heavily on opinions in which this court has stated that a plaintiff's "brief testimony" about being upset is insufficient to support an award for emotional-distress damages. *See Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1108 (6th Cir. 1984); *Erebia*, 772 F.2d at 1259. But those cases merely illustrate the rule that emotional-distress testimony must be more than "merely conclusory." *Smith*, 837 F.3d at 611. For example, in *Rodgers*, this court ordered judgment for the defendant because the plaintiff's "only evidence" of distress was his statement that he suffered a "very humiliating type of experience." 739 F.2d at 1108. In *Erebia*, the plaintiff testified only that he was "highly upset." 772 F.2d at 1259. In each case, the entirety of the plaintiff's evidence of emotional distress was a single answer at trial, unadorned by a more fulsome explanation of "the circumstances surrounding the[] emotional injuries." *Smith*, 837 F.3d at 611 (internal quotation marks omitted). In contrast, Ermold and Moore described—in extensive detail—*how* and *why* Davis's actions harmed them, and how that harm continues to affect their lives.

Davis also asserts that Plaintiffs did not corroborate *each other's* testimony, and that neither Plaintiff's testimony was supported by a medical expert. But "emotional injury may be proved without medical support." *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 485 (6th Cir. 2005) (collecting cases). Nor is there a per se rule that a plaintiff must always present testimony from another witness to corroborate his emotional distress. Rather, "[a] plaintiff's

own testimony, along with the circumstances of a particular case, can suffice." *Turic*, 85 F.3d at 1215 (citation omitted). To be sure, corroborating testimony from a witness who is close to the plaintiff can bolster the case for emotional-distress damages, *see, e.g.*, *Smith*, 837 F.3d at 611, but that does not mean such testimony is always required.

And, in any event, the Plaintiffs' testimony *was* corroborated—not only by each other, but by Davis herself. For example, Moore testified that Ermold "got really emotional" when Davis denied them a license, and that Ermold still gets "upset" when talking about Davis. R. 169, PID 2786, 2794; *see also id.* ("[W]e talk about it all the time. Dave [Ermold] brings it up. He's upset right now."). And Ermold confirmed Moore's testimony that Davis said she would give marriage licenses to straight murderers and rapists. Davis, too, testified that Moore and Ermold were "upset," "mad," and "yelling and screaming." *Id.* at 2898, 2901–02. And she agreed that she told Moore she would give a marriage license to a "heterosexual" murderer or rapist. R. 170, PID 2977. Accordingly, Plaintiffs have proven their emotional damages through their "own testimony, along with the circumstances" of this case. *Turic*, 85 F.3d at 1215 (citation omitted).

Finally, Davis makes much of Plaintiffs' testimony that they "did not know how to calculate" emotional-distress damages. Appellant's Brief at 21–23. True, Ermold stated on cross-examination that he did not "know how to calculate pain and suffering [or] emotional damages." R. 169, PID 2878–79. And Moore testified that he did not "know how people calculate" emotional damages. *Id.* at 2808–09. But Davis misunderstands the significance of that testimony. In full context, Plaintiffs did not concede that their emotional distress was valueless, as Davis asserts. Rather, Plaintiffs simply testified that they did not personally understand the legal rules for calculating emotional-distress damages. Moore explained that he did not know "the criteria" for damages calculation, *id.* at 2811–12, and Ermold stated that he did not understand "how to calculate those things," *id.* at 2878–79.

These candid admissions by lay witnesses merely reflect that "[n]o formula exists to determine with precision compensatory damages" in § 1983 cases. *Smith v. Heath*, 691 F.2d 220, 227 (6th Cir. 1982). A plaintiff's role at the damages stage of a § 1983 case is not to invent a damages formula, but to "explain the circumstances surrounding [his] emotional injuries."

*Smith*, 837 F.3d at 611 (internal quotation marks omitted).  From there, "[t]he determination of the amount of damages to be awarded is left to the discretion and good judgment of the fact finder."  *Heath*, 691 F.2d at 226 (citation omitted).  Here, both Plaintiffs and the jury fulfilled their respective roles.  Davis fails to explain why that provides a reason for reversal.

### 2.  Davis has forfeited any request for remittitur.

In her opening brief, Davis argues only that she is entitled to judgment as a matter of law.  But in her reply, Davis states for the first time that this court may "remand[] for the district court to redetermine the amount" of damages.  Reply Brief at 4.  When a court believes the jury has awarded excessive damages, it may impose a remedy known as "remittitur," in which the court "recalculate[s] the damages."  *See, e.g.*, *Hetzel v. Prince William County*, 523 U.S. 208, 211–12 (1998) (per curiam).  This appears to be the alternative remedy Davis seeks in her reply.

Davis failed to preserve this late-breaking request below and on appeal.  Davis's Rule 50(b) motion sought a single form of relief—that the court "direct entry of judgment in Defendant's favor."  R. 172, PID 3089.  Davis never asked the district court to reduce the damages award to some number below the $50,000 the jury awarded each Plaintiff.  ***Id.***  And the first time Davis mentioned recalculating damages on appeal was in her reply brief before this court.  "[E]ven well-developed arguments raised for the first time in a reply brief come too late." *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) (citing *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018)).  Accordingly, we will not address the merits of Davis's request that we remand for the district court to redetermine the amount of damages.[3]

### III.  Conclusion

For the reasons set out above, we AFFIRM.

---

[3]Davis also argues that *Obergefell* should be overturned.  She acknowledges that this court cannot overturn *Obergefell*, but she asserts she is raising the issue to preserve it for Supreme Court review.  Ironically, however, it appears that Davis did *not* preserve this issue because she never raised it below.  She did not argue that *Obergefell* should be overturned in her motion to dismiss, her motion for summary judgment, or her motion for judgment as a matter of law.  Indeed, in moving to dismiss, Davis expressly stated that she did not "want[] to relitigate the Supreme Court's decision in *Obergefell*."  R. 29-1, PID 147.

_____

# CONCURRENCE

_____

CHAD A. READLER, Circuit Judge, concurring in part and concurring in the judgment. *Obergefell v. Hodges* presented the Supreme Court with an issue that had deeply divided the nation: the right to same-sex marriage. That was certainly true as a question of public policy. *Obergefell v. Hodges*, 576 U.S. 644, 714 (2015) (Scalia, J., dissenting) (noting "the electorates of 11 States . . . chose to expand the traditional definition of marriage" but that "[m]any more decided not to"). It was arguably even more true as a question of constitutional law. In the end, the *Obergefell* majority recognized a fundamental right to same-sex marriage. *Id.* at 656, 670, 681 (majority opinion) (invoking "the transcendent importance of marriage," its promise of "nobility and dignity," and its ability to allow same-sex couples to "seek fulfillment in its highest meaning" to hold that "same-sex couples may exercise the fundamental right to marry in all States"). But that view was far from unanimous. *See, e.g.*, *id.* at 687 (Roberts, C.J., dissenting) ("The majority's decision is an act of will, not legal judgment. The right it announces has no basis in the Constitution or this Court's precedent."). In perhaps the opinion's sharpest rebuke, Justice Scalia described *Obergefell* as having "discovered in the Fourteenth Amendment a 'fundamental right' overlooked by every person alive at the time of ratification, and almost everyone else in the time since." *Id.* at 718 (Scalia, J., dissenting).

But right or wrong, the fact remains that we all must follow *Obergefell*, the law of the land. That includes Kim Davis, in her role as Rowan County Clerk. Accordingly, I agree that we should affirm the judgment against Davis. I write separately to emphasize two points with respect to Davis's claimed defenses under the First Amendment and Kentucky's Religious Freedom Restoration Act.

A. *The First Amendment.* Davis contends that, in her role as a county employee, the First Amendment's free exercise protections provide her an affirmative defense against a § 1983 claim. As it relates to the public workplace, First Amendment jurisprudence can be difficult to distill. The case law backdrop is not entirely settled. And the varying contexts in which these cases arise can make analogizing a difficult endeavor.

Begin with what we know.  Public employees retain some First Amendment rights.  In the traditional free speech setting, it is well established that when acting "pursuant to their official duties . . . employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  When speaking on matters of public concern, on the other hand, the First Amendment is more directly implicated.  *Id.* at 417.  In such cases, courts engage in a delicate balancing, asking whether an employee's speech interests are outweighed by "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968).

Today's case, however, involves free exercise aspects of the First Amendment.  *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–23 (2022) (applying the First Amendment's Free Exercise Clause to a public employee in a suit against a school district).  And the exact bounds of that right in the public workplace are even less defined, making it difficult to speak in absolutes.  *See id.* at 2433 (Thomas, J., concurring) (observing that the Court has not decided "whether or how public employees' rights under the Free Exercise Clause may or may not be different from those enjoyed by the general public").  But it seems fair to say that, at least under current law, those protections are likely diminished in the setting here—a religiously neutral job requirement to issue marriage licenses imposed upon a public employee's core job functions.  *Cf. Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." (citations omitted)).  *Contra Kennedy*, 142 S. Ct. at 2421–22 (holding that a school district's policy toward employee prayer violated the Free Exercise Clause because it was neither neutral nor generally applicable).

To the extent that the First Amendment offered Davis some shield from liability, her conduct here exceeded the scope of any personal right.  As Judge Bush recognized in a prior iteration of this case, Davis "t[ook] the law into her own hands."  *Ermold v. Davis*, 936 F.3d 429, 442 (6th Cir. 2019) (Bush, J., concurring in part and in the judgment).  And she did so in the most extreme way.  Rather than attempting to invoke a religious exemption for herself, Davis instead exercised the full authority of the Rowan County Clerk's office to enact an official policy

of denying marriage licenses to same-sex couples, one every office employee had to follow. Under this unique set of facts, I agree that the First Amendment does not shield Davis from liability.

I would rest our analysis there.  As the majority opinion notes, whether the First Amendment can provide an affirmative defense to a § 1983 claim "appears to be an issue of first impression."  Maj. Op. at 11.  Writing on this blank slate, we are wise to tread lightly.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 596 (1952) (Frankfurter, J., concurring) ("It is no less incumbent upon this Court to avoid putting fetters upon the future by needless pronouncements today.").  To that end, the fact-specific nature of our holding again bears emphasis: a government employee, acting in the scope of that employment, does not have a unilateral free exercise right to use an arm of the state to infringe on a clearly established equal protection right of the public.  Change the factual setting, and a free exercise defense to a civil rights lawsuit may have more traction.  It is always the case that "[a] later court assessing a past decision must . . . appreciate the possibility that different facts and different legal arguments may dictate a different outcome."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2281 (2024) (Gorsuch, J., concurring); *see also* Advisory Opinions, *Did Hunter Biden Get a Sweetheart Deal . . . ?*, The Dispatch, at 1:26 (June 20, 2023), https://thedispatch.com /podcast/advisoryopinions/did-hunter-biden-get-a-sweetheart-deal ("Other cases presenting different allegations and different records may lead to different conclusions." (quoting *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1231 (2023) (Jackson, J., concurring))).  Especially so, it bears emphasizing, in the evolving field of religious liberties.  *See, e.g.*, *Carson v. Makin*, 142 S. Ct. 1987 (2022); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021); *Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting) (observing that the majority opinion raises "serious questions about religious liberty").  Today's holding should thus be read in this same light.

B.  *The Kentucky Religious Freedom Restoration Act*.  Turn next to Davis's claim that Kentucky's Religious Freedom Restoration Act also shields her from liability under § 1983.  The majority opinion concludes that Kentucky's RFRA does not apply here because the state is not a party in this litigation.  That conclusion seemingly presupposes that a state law, under the right

circumstances, may provide a defense in § 1983 litigation.  While I agree that Kentucky's RFRA does not afford Davis any protection, I take a different route to that conclusion.

Kentucky's RFRA, codified at Kentucky Revised Statutes § 446.350, is a state law.  State law cannot immunize officials from a § 1983 claim, which serves to vindicate *federal* rights. 42 U.S.C. § 1983; *Williams v. Reed*, No. 23-191, 604 U.S. ——, 2025 WL 567335, at *4 (Feb. 21, 2025) ("States possess no authority to override Congress's decision to subject state officials to liability for violations of federal rights." (quotation marks and citation omitted)); *Brown v. Taylor*, 677 F. App'x 924, 930 n.4 (5th Cir. 2017) (rejecting an official's claim of immunity under the Texas Health and Safety Code); *Walker v. Norris*, 917 F.2d 1449, 1458 n.14 (6th Cir. 1990) (noting a state law cannot provide immunity with respect to a § 1983 claim).  Simply put, "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law."  *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) (citation omitted).  Construing a "federal statute [to] permit[] a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced."  *Id.*  Davis may not thwart this clear principle of law.  On that basis, I concur in the majority opinion's conclusion that Davis's Kentucky RFRA defense fails.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5524

DAVID ERMOLD; DAVID MOORE,

    Plaintiffs - Appellees,

      v.

KIM DAVIS, individually,

    Defendant - Appellant.

```
┌─────────────────────────────────┐
│            FILED                 │
│         Mar 06, 2025             │
│   KELLY L. STEPHENS, Clerk       │
└─────────────────────────────────┘
```

Before:  WHITE, READLER, and MATHIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk